# DISTRICT COURT OF APPEAL OF FLORIDA
## SECOND DISTRICT

———————————————————

STATE OF FLORIDA,

Appellant,

v.

ANDREW SCOTT CROSE,

Appellee.

No. 2D21-2784

———————————————————

January 26, 2024

Appeal from the Circuit Court for Sarasota County; Donna Padar, Judge.

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, Tallahassee, and Elba Caridad Martin, Assistant Attorney General, Tampa, for Appellant.

Howard L. Dimmig, II, Public Defender, and Daniel Muller, Assistant Public Defender, Bartow, for Appellee.

EN BANC

LUCAS, Judge.

The State of Florida appeals an order dismissing a charge against Andrew Scott Crose for failure of a sex offender to report an electronic mail address or instant message name, a violation of sections 943.0435(4)(e) and (9), Florida Statutes (2019). The issue before the

circuit court was whether, at the time of his alleged offense, Mr. Crose had completed the underlying "sanction" of his original offense such that he was required to register as a sex offender. If he had completed the sanction, he could be prosecuted for this offense; if he hadn't, he couldn't.

Whether a sex offender has completed his prior criminal sanction would seem to be a relatively simple inquiry. But a panel decision interpreting section 943.0435(1)'s definition of "the sanction," followed by a legislative amendment in response to that decision, followed by a subsequent panel decision responding to that amendment, complicates the matter. We proceed en banc today for two purposes: to resolve our conflicting panel decisions and, more broadly, to address the facet of common law that precipitated that conflict.

I.

Because of the nature of the issue we must address and how the timing of legal developments impacted the proceedings below, our recitation of the facts and our legal analysis are somewhat intertwined. In this section, we recount Mr. Crose's criminal history, the charge the State now alleges against him, and how the law concerning that criminal charge has changed during the course of the circuit court case and this appeal.

A.

In 2016, Mr. Crose was convicted for the use of a computer to seduce, solicit, or entice a child to commit a sex act in violation of section 847.0135(3)(a), Florida Statutes (2015). He was sentenced to four years in prison, followed by one year of sex offender probation, and designated as a "sex offender" under section 943.0435(1)(a)1. In 2019, after Mr. Crose had been released from prison but while he was still serving

2

probation, he was again arrested for use of a computer to solicit a child to commit a sex act and for traveling to solicit a child to commit a sex act. The State alleges that Mr. Crose used an instant message or social media account on the "MeetMe" application to commit the offense in July of that year.

In the case at bar, the State charged Mr. Crose with failure of a sex offender to report an electronic mail address or instant message name under sections 943.0435(4)(e) and (9), a third-degree felony.[1] Mr. Crose filed, pro se, a motion to dismiss the charge, arguing that since his sanction was not completed (because he hadn't finished probation) he wasn't (yet) required to register his e-mail or instant message names as a sex offender.

In order to better understand what transpired in the circuit court proceedings, we must pause here and unpack what his argument entailed. Under section 943.0435(4)(e), a designated "sex offender" is required to undertake a variety of registration requirements, including registering e-mail and instant messaging accounts. At the time of Mr. Crose's offense, the pertinent parts of section 943.0435(1)(h) defined who qualifies as a "sex offender" (and, hence, who must register) as follows:

> (h) 1. "Sexual offender" means a person who meets the criteria in sub-subparagraph a., sub-subparagraph b., sub-subparagraph c., or sub-subparagraph d., as follows:

> a. (I) Has been convicted of committing, or attempting, soliciting, or conspiring to commit, any of the criminal offenses proscribed in the following statutes in this state or

---

[1] We are informed that the State has also pursued a separate violation of probation proceeding against Mr. Crose. Nothing in our opinion today addresses any aspect of that proceeding. We would also note that although there are other statutory registration requirements for offenses such as Mr. Crose's, section 943.0435(4)(e) is the only one the State pursued in the case before us.

similar offenses in another jurisdiction: s. 393.135(2); s. 394.4593(2); s. 787.01, s. 787.02, or s. 787.025(2)(c), where the victim is a minor; s. 787.06(3)(b), (d), (f), or (g); former s. 787.06(3)(h); s. 794.011, excluding s. 794.011(10); s. 794.05; former s. 796.03; former s. 796.035; s. 800.04; s. 810.145(8); s. 825.1025; s. 827.071; s. 847.0133; s. 847.0135, excluding s. 847.0135(6); s. 847.0137; s. 847.0138; s. 847.0145; . . . or any similar offense committed in this state which has been redesignated from a former statute number to one of those listed in this sub-sub-subparagraph; and

(II) Has been released on or after October 1, 1997, **from the sanction imposed** for any conviction of an offense described in sub-sub-subparagraph (I). For purposes of sub-sub-subparagraph (I), **a sanction imposed in this state or in any other jurisdiction includes, but is not limited to, a fine, probation, community control, parole, conditional release, control release, or incarceration in a state prison, federal prison, private correctional facility, or local detention facility** . . . .

(Emphasis added.)

In *State v. James*, 298 So. 3d 90 (Fla. 2d DCA 2020), we construed this statutory language to affirm a trial court's dismissal of a failure to register charge in a situation almost identical to Mr. Crose's. The defendant in *James* had completed his incarceration, but he hadn't paid his $10,000 fine, which was part of the sanction the court had imposed. *James*, 298 So. 3d at 91. Citing fundamental principles of statutory construction, we concluded that

Mr. James' entire "sanction" for his conviction under section 800.04 consists of fifteen years' prison <u>and</u> a $10,000 fine. . . . Accordingly, his sanction, as a whole, has not been released, and he does not qualify as a "sexual offender" for purposes of reporting and registration under section 943.0435.

4

*Id.* at 92. Mr. Crose's motion to dismiss argued that *James'* interpretation and application of the statute was dispositive and required dismissal of this criminal charge.

B.

If *James* had remained the last word on the subject, the circuit court's ruling (and the assigned panel's review of it) would have been relatively uncomplicated. But within a relatively short span of time, two developments transpired.

1.

The first was the legislature's amendment to subsection (h)1 of section 943.0435(1), which was enacted during the session immediately following *James'* issuance, well after Mr. Crose's alleged offense but before the circuit court had heard Mr. Crose's motion to dismiss.

In amending the subsection, the legislature specifically stated:

> **The Legislature finds that the opinion in *State v. James*, 298 So. 3d 90 (Fla. 2d DCA 2020), is contrary to legislative intent** and that a person's failure to pay a fine does not relieve him or her of the requirement to register as a sexual offender pursuant to s. 943.0435, Florida Statutes. The Legislature intends that a person must register as a sexual offender pursuant to s. 943.0435, Florida Statutes, when he or she has been convicted of a qualifying offense and, on or after October 1, 1997, has:
>
> (1) No sanction imposed upon conviction; or
>
> (2) Been released from **a sanction** imposed upon conviction.

*See* ch. 2021-156, § 1, Laws of Fla. (2021) (emphases added). The legislature also amended section 943.0435(1)(h)1.a.II, removing "fine" from the list of penalties that could be construed as a "sanction."

Armed with this new enactment, the State sought to convince the circuit court that the charge against Mr. Crose should be allowed to proceed. The State didn't go so far as to suggest that the amended

version of the statute should apply, after the fact, to Mr. Crose's criminal charge, which arose from conduct that allegedly occurred some two years before the amendment went into effect. But the State did maintain that the circuit court could—and should—consider the legislature's stated intention when it amended the statute because the amendment "effectively overturn[ed] *James.*"

The circuit court was not persuaded by the State's arguments. In granting Mr. Crose's motion to dismiss, the court ruled:

> Based on the facts and circumstances of this case and the language of the applicable statute, the Court finds the Defendant's argument persuasive and the *James* case controlling. Though[] the legislature has now made its intent clear, the modification has not yet gone into effect. At the time the Defendant committed the alleged crime in this case, he was on probation and still under the supervision of the Department of Corrections.

The State then filed a motion for rehearing and fleshed out its prior argument. On rehearing, the State pointed out that the amendment to section 943.0435 had, in fact, gone into effect by the time the court ruled upon the motion to dismiss,[2] that *James* was not controlling "because the *James* court did not have the benefit of a clear statement of the Legislature's intent, as this Court now does," and that since the circuit court now knew what the legislature's intent about the prior version of the statutory language truly was (that is, that the completion of any part

---

[2] Factually speaking, the State was correct on this point, insofar as the amendments became effective on July 1, 2021, and the trial court rendered its order on July 30. The point, however, was a non sequitur because, again, Mr. Crose's alleged criminal conduct occurred in July of 2019. *See Allen v. State*, 324 So. 3d 920, 925 n.5 (Fla. 2021) ("[I]t is firmly established law that the statutes in effect at the time of commission of a crime control as to the offenses for which the perpetrator can be convicted, as well as the punishments which may be imposed." (quoting *State v. Smith*, 547 So. 2d 613, 616 (Fla. 1989))).

of "a sanction" should trigger the requirement to register as a sex offender), the court should deny Mr. Crose's motion to dismiss.

Mr. Crose (now represented by the Public Defender's office) countered that notwithstanding the subsequent amendment to the statute, *James* was controlling precedent and that, as such, it had to be applied to Mr. Crose's case. Furthermore, he argued that allowing the legislature to retroactively refine the application of a criminal statute violated the constitutional prohibition against ex post facto laws.[3]

The court again agreed with Mr. Crose and entered an amended order granting his motion to dismiss. In addition to the reasoning set forth in its prior order, the court added:

> [A]pplying the *new* 2021 statutory definition to Defendant's 2019 conduct runs afoul of the prohibition against ex post facto laws: "For a criminal law to be ex post facto it must be retrospective, that is, it must apply to events that occurred before its enactment; and it must alter the definition of criminal conduct or increase the penalty by which a crime is punishable." *Victorino v. State*, 241 So. 3d 48[, 50] (Fla. 2018) (citing *Lynce v. Mathis*, 519 U.S. 433 (1997)). The effect of *applying* the 2021 change in the definition of "sexual offender" to Defendant's status and his conduct in 2019 amounts to an ex post facto law.

The State then initiated its appeal.

2.

The second development arose while the State's appeal was under consideration. Before Mr. Crose filed his answer brief, this court changed course, so to speak, about how to interpret section 935.0435(1)(h)1's definition of a sexual offender. In *Hull v. State*, 349 So.

---

[3] *Accord* art. I, § 10, cl. 1, U.S. Const. ("No State shall . . . pass any Bill of Attainder, ex post facto Law . . . ."); art. I, § 10, Fla. Const. ("Prohibited laws.—No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed.").

3d 459, 464-65 (Fla. 2d DCA 2022), a divided panel "reluctantly affirm[ed]" a trial court's order denying a sexual offender's motion to dismiss a failure to register charge, concluding that, under the prior version of section 943.0435(1), "a person who has failed to pay court costs is not relieved of the requirement to register and report as a sexual offender."  The holding in *Hull* directly contradicted the court's prior holding in *James*, even though the operative term at issue in *Hull*—that the defendant be released from "the sanction"—was precisely the same one as was at issue in *James*.  Contra *James*, *Hull* held that a sex offender defendant did indeed have to register, notwithstanding his nonpayment of the $10,000 fine that was part of his criminal sanction. *Id.* at 465.

Why the turnaround from *James*?  The *Hull* majority concluded that it was bound by the "recent controversy rule" to reexamine our prior application of the prior version of section 943.0435(1).  We explained:

> Under this [the recent controversy] rule, when "an amendment to a statute is enacted soon after controversies as to the interpretation of the original act arise, a court may consider that amendment as a legislative interpretation of the original law and not as a substantive change thereof." *See Lowry v. Parole & Prob. Comm'n*, 473 So. 2d 1248, 1250 (Fla. 1985); *see also Madison at Soho II Condo. Ass'n v. Devo Acquisition Enters.*, 198 So. 3d 1111, 1116 (Fla. 2d DCA 2016).

*Id.* at 462 n.4.

Applying this rule, *Hull* held that "the legislature's abrogation of *James* and the legislature's express and specific clarification of its intent" bound the court "to conclude that a person who has failed to pay court costs is not relieved of the requirement to register and report as a sexual offender."  *Id.* at 465.

8

With Mr. Crose's appeal still "in the pipeline" at the time *Hull* issued, *see Wheeler v. State*, 344 So. 2d 244, 245 (Fla. 1977) ("The decisional law in effect at the time an appeal is decided governs the issues raised on appeal, even where there has been a change of law since the time of trial." (citing *Evans v. St. Regis Paper Co.*, 287 So. 2d 296 (Fla. 1973); *Williams v. Wainwright*, 325 So. 2d 485 (Fla. 4th DCA 1975); *Cosby v. State*, 297 So. 2d 617 (Fla. 1st DCA 1974))), the panel assigned to the case at bar found itself in the dilemma of having two recent, binding panel decisions that would yield two diametrically different outcomes. Under *James*' construction of the statute, the court's dismissal of Mr. Crose's charge would be affirmed; under *Hull*, a reversal would be required.

The State, not surprisingly, urges us to ignore *James* and follow *Hull*. Mr. Crose argues that we got it right in *James* and wrong in *Hull*. In his briefing, Mr. Crose picks up the argument raised below concerning the ex post facto application of the post-*James* statutory amendment. He maintains that the recent controversy rule amounts to an unconstitutional after-the-fact amendment of criminal law and, in all events, violates the supremacy-of-text principle of statutory construction.

On its own motion the court voted to proceed en banc. *See* Fla. R. App. P. 9.331(a). With the benefit of supplemental briefing from the parties, we now proceed with resolving this case and the conflict that has arisen in our court's panel decisions.

## II.

"Because a motion to dismiss pursuant to rule 3.190(c)(4) requires the lower court to make a pretrial determination of the law of the case when the facts are not in dispute, the standard of review on appeal is de novo." *State v. Delprete*, 331 So. 3d 174, 176 (Fla. 4th DCA 2021)

9

(quoting *State v. Benjamin*, 187 So. 3d 352, 354 (Fla. 4th DCA 2016)). There were no facts in dispute before the circuit court; this case turns on an interpretation of a statute, a legal determination that is reviewed de novo. *See Braine v. State*, 255 So. 3d 470, 471 (Fla. 2d DCA 2018) ("Statutory interpretation raises an issue of law, and we review the trial court's ruling de novo." (quoting *Wegner v. State*, 928 So. 2d 436, 438 (Fla. 2d DCA 2006))).

When interpreting statutes, the Florida Supreme Court has now instructed us to "follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.' " *Ham v. Portfolio Recovery Assocs.*, 308 So. 3d 942, 946 (Fla. 2020) (alteration in original) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)). Our interpretative work here, however, cannot be performed without first considering the body of case law surrounding the recent controversy rule, a task to which we will now turn.

### III.

Our analysis will begin with an examination of the issue seized upon in *Hull* and the heart of this case, the recent controversy rule. We will proceed through this rule's history, its development, and its current state in our district. We will then examine several reasons why we believe this common law rule can no longer be aligned within current Florida jurisprudence. We will conclude by resolving this case in light of the principles of statutory interpretation we are now charged with applying.

### A.

### 1.

We can trace the first application of what would eventually become the recent controversy rule[4] to a sales tax dispute.  In *Gay v. Canada Dry Bottling Co. of Florida*, 59 So. 2d 788, 788 (Fla. 1952), the Florida Supreme Court was called upon to decide whether a soft drink bottler purchasing bottles, cases, and parts for the purpose of distributing its products was engaged in a "retail sale" subject to tax under section 212.03(3), Florida Statutes (1949).  The court canvassed and contrasted other state court decisions that had exempted nonreturnable containers from retail sale taxes.  *Id.* at 789.  Because consumers could return the company's bottles for a cash or credit refund (which, the company argued, implicated a "for resale" exemption to the tax), the *Gay* court concluded that "[t]he State would derive no revenue whatsoever from the sale or use of all those containers which are returned to the seller of the product contained therein and by him [the seller] discarded as unfit for further use."  *Id.* at 790.  Accordingly, the sales were subject to the tax.  *Id.*

Recognizing that its interpretation might not have been "a strict adherence to the letter of the definition" in the statute, the court remarked that the "[l]egislature of this State at its 1951 session amended the Revenue Act of 1949 to specifically provide that the [resale] exemption . . . applied only to those [materials] which are intended to be

_____

[4] Although we find the substance of the rule stated as early as 1930 in the case of *Amos v. Conkling*, 126 So. 283, 288 (Fla. 1930) ("[I]t is proper to consider, not only acts passed at the same session of the Legislature, but also acts passed at prior or subsequent sessions, and even those which have been repealed." (citing *Old Homestead Bakery v. Marsh*, 242 P. 749 (Cal. Ct. App. 1925))), its underlying principle— construing prior statutes by referencing subsequent amendments— would not be applied in earnest until the 1950s.

11

used one time only." *Id.* From this development, the *Gay* court appended a new approach to construing tax statutes in Florida:

> We think, as did the California court in [*Coca-Cola Co. v. State Board of Equalization*, 156 P.2d 1, 2 (Cal. 1945),] that "This change may be considered in determining the scope of the tax statute at the time of the transactions here involved for in view of an amendment to the Retail Sales Tax Act at a time when certain groups were resisting collection of taxes assessed against them, the court could infer a legislative intent to clarify rather than change the existing law."

*Id.*

The next sentences of the opinion, however, seemed to allow (or perhaps even mandate) the application of this novel tool of construction to *any* amendment to *any* kind of statute:

> The rule seems to be well established the interpretation of a statute by the legislative department goes far to remove doubt as to the meaning of the law. *The court has the right and the duty, in arriving at the correct meaning of a prior statute, to consider subsequent legislation.*

*Id.* (emphasis added) (quoting *Gen. Petroleum Corp. of Cal. v. Smith*, 157 P.2d 356, 360 (Ariz. 1945)).

In the ensuing years, Florida courts would occasionally reference *Gay*'s holding that statutory amendments could clarify prior legislation,[5] but the recent controversy rule as we now know it wouldn't come into full bloom until 1985. That was when, for the first time, the Florida Supreme Court began to construe legislative amendments enacted *in response to legal controversies* as a tool for interpreting prior, preamendment legislative meaning. Two cases, *Lowry v. Parole & Probation Commission,*

---

[5] *See, e.g.*, *Ivey v. Chi. Ins. Co.*, 410 So. 2d 494, 497 (Fla. 1982); *Williams v. Hartford Acc. & Indem. Co.*, 382 So. 2d 1216, 1220 (Fla. 1980); *Overstreet v. Pollak*, 127 So. 2d 124, 124-25 (Fla. 3d DCA 1961).

473 So. 2d 1248 (Fla. 1985), and *State v. Lanier*, 464 So. 2d 1192 (Fla. 1985), laid the foundation for this expansion.

In *Lowry*, 473 So. 2d at 1248-49, a prisoner serving two consecutive sentences had been granted parole before he began serving his second sentence. Shortly before his parole release date, the Attorney General issued Opinion 85-11, which, construing section 947.16, Florida Statutes (1973), opined that a prisoner serving consecutive sentences could not lawfully be eligible for parole if he hadn't begun serving the latter sentence. *Id.* at 1249. Although Lowry had fulfilled his parole obligations, the parole commission adopted the Attorney General's opinion and withdrew his parole; he then filed a petition for a writ of mandamus with the supreme court. *Id.*

Working through the competing arguments, the court in *Lowry* observed:

> Petitioner and respondents have all urged cogent arguments supporting their disparate interpretations of the statutes in question. Where reasonable differences arise as to the meaning or application of a statute, the legislative intent must be the polestar of judicial construction. *Tampa-Hillsborough County Expressway Authority v. K.E. Morris Alignment Services, Inc.,* 444 So. 2d 926 (Fla. 1983); *Tyson v. Lanier,* 156 So. 2d 833 (Fla. 1963). Petitioner and respondent filed notices of pending legislation ordered enrolled, bringing to the Court's attention Committee Substitute for House Bill 1298, ordered enrolled May 30, 1985 and submitted to the Governor and signed into law June 11, 1985, effective upon becoming law. This bill clarified the manner in which presumptive parole release dates are to be calculated for prisoners serving consecutive sentences. It specifically provides that "The guidelines shall require the commission to aggravate or aggregate each consecutive sentence in establishing the presumptive parole release date." At oral argument, counsel for respondent Wainwright conceded that under the pending legislation, petitioner would be entitled to release.

> *When, as occurred here, an amendment to a statute is enacted soon after controversies as to the interpretation of the original act arise, a court may consider that amendment as a legislative interpretation of the original law and not as a substantive change thereof.* United States ex rel. Guest v. Perkins, 17 F. Supp. 177 (D.D.C. 1936); *Hambel v. Lowry*, 264 Mo. 168, 174 S.W. 405 (Mo. 1915). This Court has recognized the propriety of considering subsequent legislation in arriving at the proper interpretation of the prior statute. *Gay v. Canada Dry Bottling Co.*, 59 So. 2d 788 (Fla. 1952).
>
> In examining Chapter 947 in light of section 775.021(4), Florida Statutes (1983) and section 775.087(2), Florida Statutes (1983), it is unmistakable that *the amendments contained in the pending bill are expressions of prior and continuing legislative intent.* Thus we hold that while AGO 85-11 is a reasonable interpretation of the law, it does not represent legislative intent.

*Id.* at 1249-50 (emphasis added).

*Lanier* offered a more succinct—and more robust—application of this approach. In *Lanier*, 464 So. 2d at 1193, the court accepted jurisdiction of a question of great public importance as to whether a defendant could be convicted of a lewd, lascivious, or indecent act on a twelve-year-old child where "the undisputed facts reveal that the twelve-year-old was previously unchaste and the sexual intercourse was consensual." The Third District had answered the question in the negative. *Id.* The Florida Supreme Court disagreed and quashed the appellate court's decision. *Id.*

The entire basis of *Lanier*'s rationale was an amendment to the pertinent criminal statute, section 800.04, Florida Statutes (1983), that occurred shortly after the question had been certified. *Id.* That amendment, "which was designed to specifically cover the acts committed in the instant case," provided that neither lack of chastity nor consent could be a defense to that particular crime. *Id.* The court

14

acknowledged that it had to apply the statute "as it existed at the time the allegedly lewd and lascivious acts occurred, prior to the enactment of the amendment." *Id.* And the court was not "bound by statements of legislative intent uttered subsequent to either the enactment of a statute or the actions which allegedly violate the statute." *Id.* Nevertheless, the court would "show great deference to such statements, especially in a case such as this, when the enactment of an amendment to a statute is passed merely to clarify existing law." *Id.* That "great deference" compelled the court to conclude that the legislature's subsequent disavowal of these defenses indicated that the legislature never intended for them to be defenses in the first place. *Id.*

Since *Lanier* and *Lowry*, statutory amendments have been marshalled to ascertain the meaning of preamendment statutory text on numerous occasions. *See, e.g., Hardee County v. FINR II, Inc.*, 221 So. 3d 1162, 1167 (Fla. 2017); *Metropolitan Dade County v. Chase Fed. Hous. Corp.*, 737 So. 2d 494, 503 (Fla. 1999); *Finely v. Scott*, 707 So. 2d 1112, 1116-17 (Fla. 1998); *Palma Del Mar Condo. Ass'n #5 of St. Petersburg, Inc. v. Com. Laundries of W. Fla., Inc.*, 586 So. 2d 315, 317 (Fla. 1991); *Hull*, 349 So. 3d at 459; *Madison at Soho II Condo. Ass'n v. Devo Acquisition Enters.*, 198 So. 3d 1111, 1116 (Fla. 2d DCA 2016); *Essex Ins. Co. v. Integrated Drainage Sols., Inc.*, 124 So. 3d 947, 952 (Fla. 2d DCA 2013); *Archstone Palmetto Park, LLC v. Kennedy*, 132 So. 3d 347, 352-53 (Fla. 4th DCA 2014); *Sch. Dist. of Martin Cnty. v. Pub. Emps. Rels. Comm'n*, 15 So. 3d 42, 45-46 (Fla. 4th DCA 2009); *G.E.L. Corp. v. Dep't of Env't Prot.*, 875 So. 2d 1257, 1262-63 (Fla. 5th DCA 2004); *State Dep't of Bus. & Prof. Reg., Div. of Pari-Mutuel Wagering v. WJA Realty Ltd. P'ship*, 679 So. 2d 302, 306 (Fla. 3d DCA 1996); *Kaplan v. Peterson*, 674 So. 2d 201, 205 (Fla. 5th DCA 1996); *State Dep't of Banking & Fin. v. Evans*, 540 So. 2d

884, 887 (Fla. 1st DCA 1989); *State Dep't of Lab. & Emp. Sec. v. Mission Ins. Co.*, 507 So. 2d 137, 138 n.1 (Fla. 1st DCA 1987).

Though it is more frequently invoked in civil controversies, the Florida Supreme Court has been clear that this tool for divining legislative intent is available in criminal cases. As the court explained in *Leftwich v. Florida Department of Corrections*, 148 So. 3d 79, 84 (Fla. 2014), "the United States Supreme Court has held that the federal ex post facto clause generally does not apply to judicial precedent." (citing *Marks v. United States*, 430 U.S. 188, 191 (1977)). Thus, while a clarifying amendment cannot be used to construe an ambiguous criminal statute in a way that would result in a longer prison sentence, an amendment to a criminal statute may still be relevant to determine the intent of the previous version of the statute. *Id.* at 83; *see also Hull*, 349 So. 3d at 465 ("[T]he legislature explicitly clarified that failure to pay a 'fine' in this context does *not* relieve a person 'of the requirement to register as a sexual offender.' Ch. 2021-156, § 1, Laws of Fla. . . . Under the recent-controversy rule, it follows that the term costs should not be read into the definition of sanction in the preamendment version of the statute."); *Burgos v. State*, 765 So. 2d 967, 968 (Fla. 4th DCA 2000) (construing statutory amendment to clarify felon registration requirements, which were "regulatory, not punitive" and thus, did not violate the ex post facto prohibition); *State v. Sedia*, 614 So. 2d 533, 535 (Fla. 4th DCA 1993) (relying on a 1992 amendment, which stated "[t]he legislature . . . *never intended* that the sexual battery offense described in 794.011(5) require any force or violence beyond the force and violence that is inherent in the accomplishment of 'penetration' or 'union' " and remarking "the legislature left no doubt as to its initial intention").

16

To be sure, there are times when courts have declined to consider subsequent amendments when interpreting a prior version of a statute. *See, e.g.*, *Nunez v. Geico Gen. Ins. Co.*, 117 So. 3d 388, 398 (Fla. 2013); *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1230-31 (Fla. 2006); *McKenzie Check Advance of Fla., LLC v. Betts*, 928 So. 2d 1204, 1210 (Fla. 2006); *Parole Comm'n v. Cooper*, 701 So. 2d 543, 544-45 (Fla. 1997); *State Farm Mut. Auto. Ins. Co. v. Laforet*, 658 So. 2d 55, 61-62 (Fla. 1995); *Dean Wish, LLC v. Lee County*, 326 So. 3d 840, 850-52 (Fla. 2d DCA 2021); *Ramcharitar v. Derosins*, 35 So. 3d 94, 98-99 (Fla. 3d DCA 2010); *Betts v. McKenzie Check Advance of Fla., LLC*, 879 So. 2d 667, 674 (Fla. 4th DCA 2004); *Kleparek v. State*, 634 So. 2d 1148, 1148 (Fla. 4th DCA 1994). But discerning an articulable and replicable basis for that refrainment—whether because of the span of time between an original enactment and its amendment or the length of years between when a controversy arises and when an amendment is enacted in response to the controversy or the degree of interpretive clarification that's necessary to construe a prior statute—has remained an elusive, and largely unsuccessful, endeavor in Florida case law. *Compare Nunez*, 117 So. 3d at 398 ("We therefore find that the 2012 amendment at issue amounts to a substantive change, not just a legislative clarification, of the PIP statute, especially considering the careful examination that applies in this context and our responsibility to construe the provisions of Florida's No-Fault Act liberally in favor of the insured."), *and Dadeland Depot*, 945 So. 2d at 1230-31 (declining to apply rule, stating "[w]e are also mindful that the Legislature's recent amendment to section 624.155 was passed twenty-three years after that statutory section's original enactment, and some six years after the Southern District's opinion . . . in which the district court indicated concern as to the correct

17

interpretation of the term 'insured' "), *and Betts*, 928 So. 2d at 1210 ("[W]e conclude that seven years is too long to view the amendment as merely a clarification of legislative intent."), *and Cooper*, 701 So. 2d at 544-45 ("[I]t is inappropriate to use an amendment enacted ten years after the original enactment to clarify original legislative intent."), *and Laforet*, 658 So. 2d at 62 ("It would be absurd, however, to consider legislation enacted more than ten years after the original act as a clarification of original intent . . . ."), *and Ramcharitar*, 35 So. 3d at 98 (declining to apply rule since "the 2003 revision to section 440.10 occurred twenty years after the Court decided *Abernathy* and some twenty-nine years after the 1974 amendment to section 440.10"), *with FINR II, Inc.*, 221 So. 3d at 1165, 1167 (holding that the "plain language of the [Bert Harris] Act provides that claims under the Act may not be based on government action on another parcel," but noting that, "[b]ecause reasonable minds may disagree with this interpretation" a statutory amendment passed nearly two decades after the original act "made clear that the Act does not apply to property owners whose parcel is not 'the subject of and directly impacted by the action of a governmental entity' " (quoting ch. 2015-142, § 1, Laws of Fla. (2015))), *and State v. Bodden*, 877 So. 2d 680, 688 n.13 (Fla. 2004) (noting, in dicta, that a 2003 amendment to section 316.1932, Florida Statutes (2002), clarified meaning of a statute that was first enacted twenty-one years earlier), *and Lowry*, 473 So. 2d at 1249, 1250 (considering 1985 amendments to parole statutes to construe a section that "has not changed in any material way since 1974"), *and Essex Ins.*, 124 So. 3d at 951-52 (observing, in dicta, that by enacting a 2009 amendment to an insurance statute "quickly" after a Florida Supreme Court decision, the legislature "clarified that it had intended since 1988 that chapter 627 did

18

not apply to surplus lines carriers"), *and G.E.L.*, 875 So. 2d at 1262-63 (construing 2003 amendments to section 57.105, Florida Statutes (2002), as clarifying the intent of section 120.595(1), which was enacted in 1996), *and Burgos*, 765 So. 2d at 968-69 (applying rule to clarify meaning of "conviction" for felon registration where amendment was enacted two years after the applicable version of the statute and forty-one years after the statute's original enactment).

If the recent controversy rule is indeed a tool of statutory interpretation, it seems an inconsistent, and awfully slippery, one to wield.

## 2.

Our court has certainly struggled to gain a firm grip on the rule in the three most recent occasions we've addressed it. In *Madison at Soho*, 198 So. 3d at 1113-14, for example, a dispute over unpaid condominium assessments revolved around the applicability of accord and satisfaction. (The owner, who was in foreclosure, argued that the condominium association's acceptance of its $2,412 check constituted an accord and satisfaction of its unpaid $40,645.70 association debt.) *Id.* at 1113. Our court had issued a decision in 2014, *St. Croix Lane Trust v. St. Croix at Pelican Marsh Condominium Ass'n*, 144 So. 3d 639 (Fla. 2d DCA 2014), holding that section 718.116(3), Florida Statutes (2014), never intended to displace accord and satisfaction for condominium association payments; but in 2015, the legislature amended that subsection to do just that. *Id.* at 1115. Although the amendment was not in effect at the time of the operative events, and despite the binding precedent of *St. Croix Lane Trust*, we concluded in *Madison at Soho* that the association's acceptance of the check could not operate as an accord and satisfaction as a matter of law. *Id.* at 1113.

19

The *Madison at Soho* court began its analysis with an invocation to *Gay*: "Florida courts have 'the right and the duty' to consider the legislature's recently enacted statute clarifying its intent in a prior version of a statute, which was passed soon after a controversy arose in the interpretation of that original, pre-amended statute." *Id.* at 1116 (quoting *Ivey v. Chi. Ins. Co.*, 410 So. 2d 494, 497 (Fla. 1982)). Neither the presumption against retroactivity nor stare decisis stood in the way of that "duty": we noted that "when the Florida Supreme Court has had occasion to simultaneously consider retroactivity and the recent controversy rule, it has treated the recent controversy rule as an inquiry that is distinct from retroactive application," and we held that "with the benefit of hindsight and the legislature's recent clarifying amendment," we were free to "revisit our *St. Croix Lane Trust* decision." *Id.* at 1116, 1118. Accord and satisfaction was never intended to be available in these circumstances, as evidenced by the new amendment, for the legislature "clearly intended for section 718.116(3) to function this way all along." *Id.* at 1119. More than that, the amendment not only clarified the prior legislation's intent—it "abrogated" our holding in *St. Croix Lane Trust* altogether. *Id.*

But five years later we took a far more circumspect view of the recent controversy rule in *Dean Wish, LLC v. Lee County*, 326 So. 3d 840 (Fla. 2d DCA 2021). A landowner had brought a Bert Harris Act claim against Lee County following the county's rezoning (and decrease of permissible development density) of the owner's land on Pine Island. *Id.* at 842-43. Litigation dragged on for some time, so long that one of the plaintiff owners retired and sold the property at auction; but it retained its rights in the lawsuit against the county, which it wished to continue. *Id.* at 844. The circuit court found this transfer fatal to the plaintiffs'

20

standing and granted summary judgment in favor of the county. *Id.* at 844-45. The court construed section 70.001(3)(f), Florida Statutes (2018), of the Bert Harris Act (which defined "property owner" in the present tense as "the person who holds legal title to the real property") to require a plaintiff owner to be the current legal title holder of the affected property. *Id.* at 845-46. On appeal, our court agreed. *Id.* at 849.

But shortly after we issued our first opinion, the legislature approved amendments to the statute, including one that stated "[a] property owner entitled to relief under this section retains such entitlement to pursue the claim if the property owner filed a claim . . . but subsequently relinquishes title to the subject real property before the claim reaches a final resolution." *Id.* at 850 (alteration in original) (quoting ch. 2021-203, § 1, Laws of Fla.). On a motion for clarification of the prior opinion, the *Dean Wish* court issued a new opinion addressing the effect of this amendment.[6]

A divided panel rejected the former landowner's argument that the amendment served as legislative clarification of the prior law. Although we acknowledged courts "*may* look to a statutory amendment," *id.* at 850 (emphasis added), if a statute's language is clear, the court was bound to apply the original statute as it was written: "[W]e are not compelled to apply the recent controversy rule to unambiguous statutes," *id.* at 851. Since the Bert Harris Act's language defining "property owner" was clear, "we need not look at the 2021 amendment to discern a prior legislative

---

[6] The prior opinion, *Dean Wish, LLC v. Lee County*, 46 Fla. L. Weekly D762 (Fla. 2d DCA Apr. 7, 2021), was withdrawn and superseded on clarification by 326 So. 3d 840. The newly issued opinion encompassed the *Dean Wish* court's initial conclusions as well as addressing the amendment. *See generally Dean Wish, LLC*, 326 So. 3d 840.

intent." *Id.* at 850. Furthermore, the *Dean Wish* majority noted, the pertinent provisions of the Act had remained unchanged for twenty-six years, which "weigh[ed] against exercising our discretion to use the 2021 amendment to interpret the prior meaning of the Act's provision." *Id.* at 852.

In dissent, Judge Black maintained that the amendment "change[d] the central issue of this case." *Id.* at 855. Although the definition of property owner may have remained unchanged for decades, as he pointed out, the " '[s]trict adherence' to the rule that the court is reluctant to consider subsequent legislation when an amendment is passed long after the original act was made law" is relaxed "*when a subsequent amendment is enacted soon after a controversy regarding a statute's interpretation has arisen.*" *Id.* at 856-57 (alteration in original) (quoting *Dadeland Depot*, 945 So. 2d at 1230). According to Judge Black, "[t]he addition to section 70.001(2) clarifie[d] what ha[d] always been the case: ownership at the time the property is burdened is critical to entitlement to relief." *Id.* at 857.

If *Madison at Soho* embraced the "duty" to apply the recent controversy rule, *Dean Wish* held it at a discretionary arm's length. Our most recent decision in *Hull* sided with *Madison at Soho*, albeit with less enthusiasm. As in *Madison at Soho*, the *Hull* majority acknowledged a recent amendment had been enacted in response to the "controversy" of one of our prior decisions.[7] *Hull*, 349 So. 3d at 461. Because the legislature had "clarified" section 943.0435(1)(h) by changing "the sanction" to "a sanction" and then specifically exempting fines from the

---

[7] It had little choice. The legislature tied a rather sizeable bow around the point, stating "the opinion in *State v. James*, 298 So. 3d 90 (Fla. 2d DCA 2020), is contrary to legislative intent." *Hull*, 349 So. 3d at 463 (quoting ch. 2021-56, § 1, Laws of Fla. (2021)).

definition of the word, the majority felt compelled to reexamine our holding in *James*. This was necessary, *Hull* reasoned, "[g]iven our fundamental mandate to construe statutes so as to 'give effect to legislative intent.' " *Id.* at 463. "Recognizing—as we must—the legislature's abrogation of *James* and the legislature's express and specific clarification of its intent, we are bound to conclude that a person who has failed to pay court costs is not relieved of the requirement to register and report as a sexual offender." *Id.* at 465. The majority so held despite its view that *James* had correctly construed the prior statute and despite its misgivings about the recent controversy rule in general. *Id.* at 464 n.6.

Judge Atkinson's dissent in *Hull* catalogued still more misgivings with the rule. First, he argued that the statutory text at issue was clear and unambiguous and that *James* had properly applied the text's "plain and ordinary meaning." *Id.* at 466. Irrespective of any latter legislative clarification, the *Hull* panel was bound to follow *James* because *James* was a prior, binding decision of the court. *Id.* Furthermore, to the extent the rule "is employed in abrogation of the meaning of the text of a pre-amendment version of a statute, the rule is inconsistent with our charge as members of the judicial branch" because it violates the supremacy-of-text principle of statutory interpretation. *Id.* at 467. In that same vein, he observed that the recent controversy rule "can be used to usurp the authority of the legislature that enacted the text of the applicable version of the statute and supplant those words with an expression of more recent legislative will that is potentially in derogation of the text." *Id.* at 468. Finally, Judge Atkinson questioned how the *Hull* majority could apply "an amended version of a criminal statute to an alleged violation that took place prior to the effective date" of the legislation. *Id.* at 473.

23

So in the span of eight years, we have three published decisions from our court that have yielded two split panels, two panels effectively decreeing a prior panel's decision dead letter law, one panel construing the recent controversy rule as discretionary, and another two as quasi-mandatory. *Madison at Soho*, *Dean Wish*, and *Hull*'s respective applications of the recent controversy rule simply cannot be reconciled. Either the rule is mandatory or it's discretionary; either its operation hinges on subsequent legislation's enactment or on prior legislation's ambiguity; either it truly acts as a tool for clarifying legislative intent or it is, truly, "retroactivity by another name." *Hull*, 349 So. 3d at 466.

The need for us to proceed en banc has become self-evident.

B.

If the case law discussed above were all there were, we would simply do our best as an en banc court to try to discern a coherent thread in these disparate decisional strands and weave our district's conflicting case law into something a little more cogent. But there's one thing more we must consider—quite a big thing, actually.

Between 2020 and 2022 (the same period of time, coincidentally, that *James* and *Hull* were being decided), the Florida Supreme Court fundamentally changed the framework through which Florida courts interpret statutes. Mr. Crose has put that change front and center in his arguments for affirmance in this appeal.

1.

Traditionally, Florida courts focused their interpretive work on discerning the "legislative intent" of statutory text. What did the legislature mean when it enacted a particular piece of legislation? One of the most frequently cited pronouncements of this approach was set forth in *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984):

24

Florida case law contains a plethora of rules and extrinsic aids to guide courts in their efforts to discern legislative intent from ambiguously worded statutes. However,

> [w]hen the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning.

*A.R. Douglass, Inc. v. McRainey*, 102 Fla. 1141, 1144, 137 So. 157, 159 (1931). *See also Carson v. Miller*, 370 So. 2d 10 (Fla. 1979); *Ross v. Gore*, 48 So. 2d 412 (Fla. 1950). It has also been accurately stated that courts of this state are

> without power to construe an unambiguous statute in a way which would extend, modify, or *limit,* its express terms or its *reasonable and obvious implications.* To do so would be an abrogation of legislative power.

*American Bankers Life Assurance Company of Florida v. Williams*, 212 So. 2d 777, 778 (Fla. 1st DCA 1968) (emphasis added). It is also true that a literal interpretation of the language of a statute need not be given when to do so would lead to an unreasonable or ridiculous conclusion. *Johnson v. Presbyterian Homes of Synod of Florida, Inc.*, 239 So. 2d 256 (Fla. 1970). Such a departure from the letter of the statute, however, "is sanctioned by the courts only when there are cogent reasons for believing that the letter [of the law] does not accurately disclose the [legislative] intent." *State ex rel. Hanbury v. Tunnicliffe*, 98 Fla. 731, 735, 124 So. 279, 281 (1929).

(Alterations in original.)

The "extrinsic aids" available to discern legislative intent were many and varied, as were the exceptions to construing unambiguous statutes according to their text—which came to be perceived as a problem with this approach. *Cf. Schoeff v. R.J. Reynolds Tobacco Co.*, 232 So. 3d 294, 313-14 (Fla. 2017) (Lawson, J., concurring in part and dissenting in part)

25

("Florida's appellate courts have for decades routinely framed the statutory construction task in general (for all cases) as starting with the 'legislative intent as polestar' maxim. . . . [B]y focusing first on the more amorphous concept of intent, we are more likely to read into the language our own subjective experiences and biases—assuming unintentionally and subconsciously that the Legislature would have intended the meaning that intuitively strikes us as correct.").

2.

In 2020, the Florida Supreme Court began to reformulate the paradigm of statutory interpretation. In *Ham v. Portfolio Recovery Associates, LLC*, 308 So. 3d 942, 946-47 (Fla. 2020), the court was called upon to resolve a conflict between the districts as to whether the reciprocal fee provision of section 57.105(7), Florida Statutes (2015), applied to an account stated cause of action on a credit card debt. Notably, at the outset of its statutory analysis, the *Ham* court omitted any mention of *Holly* or legislative intent; instead, the court framed the labor of statutory interpretation in much more definitive terms:

> In interpreting the statute, we follow the "supremacy-of-text principle"—namely, the principle that "[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012). We also adhere to Justice Joseph Story's view that "every word employed in [a legal text] is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." *Advisory Op. to Governor re Implementation of Amendment 4, the Voting Restoration Amendment*, 288 So. 3d 1070, 1078 (Fla. 2020) (quoting Joseph Story, *Commentaries on the Constitution of the United States* 157-58 (1833), *quoted in* Scalia & Garner, *Reading Law* at 69).

26

We thus recognize that the goal of interpretation is to arrive at a "fair reading" of the text by "determining the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." Scalia & Garner, *Reading Law* at 33. This requires a methodical and consistent approach involving "faithful reliance upon the natural or reasonable meanings of language" and "choosing always a meaning that the text will sensibly bear by the fair use of language." Frederick J. de Sloovère, *Textual Interpretation of Statutes*, 11 N.Y.U. L.Q. Rev. 538, 541 (1934), *quoted in* Scalia & Garner, *Reading Law* at 34.

*Id.* at 946-47 (alterations in original); *see also Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021) (defining and applying supremacy-of-text method of statutory interpretation).

Two years after *Ham*, the court both reemphasized the supremacy-of-text principle *and unequivocally abandoned the legislative intent approach* emblemized in *Holly*. Addressing a certified question from the United States Court of Appeals for the Eleventh Circuit, the court in *Conage v. United States*, 346 So. 3d 594, 598 (Fla. 2022), held:

We believe that the *Holly* principle is misleading and outdated. More recently our Court has said that judges must "exhaust 'all the textual and structural clues' " that bear on the meaning of a disputed text. *Alachua County v. Watson*, 333 So. 3d 162, 169 (Fla. 2022) (quoting *Niz-Chavez v. Garland*, ___ U.S. ____, 141 S. Ct. 1474, 1480, 209 L.Ed.2d 433 (2021)). That is because "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 136 L.Ed.2d 808 (1997).

Viewed properly as rules of thumb or guides to interpretation, rather than as inflexible rules, the traditional canons of statutory interpretation can aid the interpretive process from beginning to end (recognizing that some canons, like the rule of lenity, by their own terms come into play only

27

> after other interpretive tools have been exhausted). It would be a mistake to think that our law of statutory interpretation requires interpreters to make a threshold determination of whether a term has a "plain" or "clear" meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute.

(Alteration in original.)

Since then, the supreme court's marching orders for interpreting legislation have been clear: to derive the meaning of statutes, we are to look to the text itself, as understood in its context, not to any purported intent underlying the text. *See, e.g., Tsuji v. Fleet*, 366 So. 3d 1020, 1025 (Fla. 2023) ("When we construe statutes, 'our first (and often only) step . . . is to ask what the Legislature actually said in the statute, based upon the common meaning of the words used' when the statute was enacted." (quoting *Shepard v. State*, 259 So. 3d 701, 705 (Fla. 2018))); *Coates v. R.J. Reynolds Tobacco Co.*, 365 So. 3d 353, 354 (Fla. 2023) ("In deciding whether this statute is a prevailing-party statute, we apply the supremacy-of-the-text principle, recognizing that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.' " (quoting *Levy*, 326 So. 3d at 681)); *Lab. Corp. of Am. v. Davis*, 339 So. 3d 318, 323 (Fla. 2022) ("In interpreting a statute, our task is to give effect to the words that the legislature has employed in the statutory text. 'The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.' " (quoting *Ham*, 308 So. 3d at 946)).

It is not hyperbole to observe that *Conage*'s displacement of *Holly* and the supreme court's recent embrace of the supremacy-of-text principle constituted a paradigm shift in Florida law. In the next section, we carry this evolution in the law forward to consider the case at bar and

confront the question of whether the recent controversy rule as a method for discerning legislative intent retains any operative space in the supremacy-of-text model of statutory interpretation.

## IV.

Mr. Crose posits that the recent controversy rule and the supremacy-of-text principle are "completely incompatible." He's correct. We explain why in this section.

## A.

The recent controversy rule is, root and branch, an offshoot of the legislative intent approach to ascertaining statutory meaning. Its pronouncements in the law claim as much. *Accord Leftwich*, 148 So. 3d at 83 ("[A] statutory amendment may be relevant to a determination of *the intent behind the previous statute.*" (emphasis added) (citing *Lowry*, 473 So. 2d at 1250)); *Lowry*, 473 So. 2d at 1250 ("[T]he amendments contained in the pending bill *are expressions of prior and continuing legislative intent.*" (emphasis added)); *Madison at Soho*, 198 So. 3d at 1116-17 ("Because we are applying the legislature's amendment, *which clarified the legislature's intent in a prior version of a statute* after a recent controversy, we do not apply retroactivity principles here." (emphasis added)). As one commentator remarked, applying clarifying amendments to derive the meaning of prior statutes should "be seen as 'the two branches work[ing] in partnership to accomplish the legislative agenda.' " *See* Pat McDonnel, *The Doctrine of Clarifications*, 119 Mich. L. Rev. 797, 815 (2021) (alteration in original) (quoting Linda D. Jellum, *"Which Is to Be Master," the Judiciary or the Legislature? When Statutory Directives Violate Separation of Powers*, 56 UCLA L. Rev. 837, 882 (2009)). The recent controversy rule can only function if one accepts the notion that legislative meaning (or, if you like, a "legislative agenda") holds some

29

separate telos distinct from the text the legislature had enacted—and that it is the court's job to discover what that telos is.

The State, however, will neither bury nor praise the recent controversy rule. In its supplemental briefing it acknowledges that courts have at times wielded the rule too forcefully. Nevertheless, according to the State, a legislative amendment enacted shortly after a controversy arises may still be "probative (though not dispositive) of what the text meant all along," not unlike "an amicus brief written on behalf of the House and Senate" in a pending case. As the State sees it, "this one-factor-among-many approach to the recent controversy rule is a proper 'tool' in the textualist's toolkit."

How can that be? You can use a hammer for all sorts of things, but it's *meant* for hammering. When the job at hand no longer calls for hammering, you shouldn't reach for that tool. A court using an atextual, intent-centric tool in a supremacy-of-text analysis would be like a homeowner trying to hammer a lightbulb into a socket to gain more illumination.

The courts fashioned this common law tool for one purpose: to break through statutory text and discover the hidden legislative intent beneath a statute's words.[8] The recent controversy rule doesn't shed light on statutory context. It isn't a rule of grammar. And it's not a surrogate for a dictionary. While we recognize that the Florida Supreme Court "does not intentionally overrule itself sub silentio," *F.B. v. State*, 852 So. 2d 226, 228 (Fla. 2003) (quoting *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002)), when the court fundamentally changes a first-order, long-standing paradigm of widespread application, some of its

---

[8] Indeed, the recent controversy rule could be the exemplar *par excellence* of an intent-centric tool of construction.

prior case law may fall by the wayside. We believe that is what has happened to the recent controversy rule.

Guided by the Florida Supreme Court's pronouncements in *Ham* and *Conage,* we hold that consulting subsequent legislative amendments in response to recent controversies is no longer a viable basis for construing the meaning of a statute.[9] We recede from *Hull* and *Madison at Soho* to the extent they held to the contrary.

B.

Having so held, we can turn to the merits of Mr. Crose's case. As we observed at the outset, Mr. Crose's circumstances, as well as his argument about the proper interpretation of the preamendment version of section 943.0435, are virtually indistinguishable from the defendant's in *James.* Since our entire basis for declaring *James* "abrogated" in *Hull* was the recent controversy rule—which we've now determined is inconsistent with a supremacy-of-text approach to statutory interpretation—we are free to construe Mr. Crose's arguments in accordance with *James'* holding. The only question we need now address is whether *James* was a felicitous application of the supremacy-of-text principle to section 943.0435.

1.

We think it was. Again, the prior, applicable version of the statute tethered sex offender registration to completion of "the sanction imposed" and then went on to state that "a sanction . . . includes, but is not limited to, a fine, probation, community control, parole, conditional

_____

[9] We would note that the supreme court itself has questioned the continued viability of the recent controversy rule. *See Dadeland Depot,* 945 So. 2d at 1230 ("However, this tool of statutory construction was called into question somewhat by our opinion in *Knowles v. Beverley-Enterprises-Florida, Inc.,* 898 So. 2d 1 (Fla. 2004).").

31

release, control release, or incarceration in a state prison, federal prison, private correctional facility, or local detention facility."
§ 943.0435(1)(h)1.a.II., Fla. Stat. (2017).

The use of the definite article "the," in this context, clearly and unambiguously indicated a holistic, collective meaning for "sanction." Release from "the sanction imposed" meant just that: release from "the sanction" the State had imposed, not just a particular piece of that sanction. *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("Here grammar and usage establish that 'the' is 'a function word . . . indicat[ing] that a following noun or noun equivalent is definite or has been previously specified by context.' " (alterations in original) (quoting Merriam-Webster's Collegiate Dictionary 1294 (11th ed. 2005))); *Covey v. Shaffer*, 277 So. 3d 694, 696-97 (Fla. 2d DCA 2019) ("The indefinite article a has an accepted sense of 'any,' while the definite article, the, used before a noun specifies a definite and specific noun, as opposed to any member of a class." (quoting *Myers v. State*, 696 So. 2d 893, 900 (Fla. 4th DCA 1997))). That construction is not only evinced by the commonly understood meaning of "the" when applied to a term with multiple aspects; it is confirmed textually by the remainder of the statute, which switches to the indefinite article "a" to list the various constituent components a "sanction" may comprise. *See Famiglio v. Famiglio*, 279 So. 3d 736, 741 (Fla. 2d DCA 2019) ("The purpose of the indefinite article is to indicate a noun that is, in some way, variable, unidentified, or unspecified." (citing *Retreat at Port of Islands, LLC v. Port of Islands Resort Hotel Condo. Ass'n*, 181 So. 3d 531, 533 (Fla. 2d DCA 2015))).

Moreover, *James*' interpretation avoided the ambiguity an alternative construction would have foisted: if registration is required

32

following release from any part of "the sanction," which of the several and distinct sanctions specifically defined in the statute becomes "the sanction" for purposes of the registration requirement? *Cf. State v. Hobbs*, 974 So. 2d 1119, 1121 (Fla. 5th DCA 2008) (noting that statutory construction canons "should only come into play when it is necessary to construe an ambiguous statute, not to create an ambiguity in a clearly worded statute" (citing *Jacobo v. Bd. of Trs. of Miami Police*, 788 So. 2d 362, 363 (Fla. 3d DCA 2001))). Finally, as *James* observed, the legislature had, elsewhere, enacted an automatic designation provision in the Sexual Predator Act, but not in section 943.0435. *See James*, 298 So. 3d at 93. "[W]hen the legislature has included a provision in one statute, but omitted it in an analogous statute, courts should not read it into the statute from which it has been excluded." *Id.* (citing *Mesen v. State*, 271 So. 3d 164, 169 (Fla. 2d DCA 2019)).

Is *James*' construction consistent with what a subsequent legislature declared its predecessor had originally intended? Apparently not. It is, however, entirely consistent with the actual words that prior legislature enacted.[10] Like the Florida Supreme Court, in this case "we need only resort to what Justice Thomas has described as the 'one, cardinal canon [of construction] before all others'—that is, we 'presume that a legislature says in a statute what it means and means in a statute what it says there.' " *Page v. Deutsche Bank Tr. Co. Ams.*, 308 So. 3d 953, 958 (Fla. 2020) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). The prior legislature had tied sex offender registration to a defendant's release from "the sanction imposed," not "a sanction" or

---

[10] The State concedes that this is not one of those exceptionally rare circumstances where the absurdity doctrine compels a particular construction of the statute.

33

"any sanction."  Because that is what the words of the statute conveyed, that is what the text of the statute meant.  *See Ham*, 308 So. 3d at 946; *Allstate Mortg. Corp. of Fla. v. Strasser*, 286 So. 2d 201, 202-03 (Fla. 1973) (observing that the legislature "is presumed to know the meanings of words and rules of grammar" (citing *State ex rel. Hanbury v. Tunnicliffe*, 124 So. 279 (Fla. 1929))).

2.

In its supplemental briefing, the State argues that when section 943.0435(1)(h) is read within a broader context of the purpose of sex offender statutes and alongside other statutory registration requirements, the operative term "sexual offender" takes on a different, broader meaning than what the text of section 943.0435(1)(h) actually states.  "[T]ext and context establish that 'the sanction' . . . is a generic phrase that refers to *any* sanction from which the offenders has been released," according to the State.  (Emphasis added.)  We disagree for the following five reasons.

First and foremost, as we've already explained, "the" does not usually mean the same thing as "any" or "a."  Definite articles and indefinite articles typically connote different meanings, and they serve very different communicative functions.  *See, e.g.*, Paul W. Lovinger, *The Penguin Dictionary of American English Usage and Style* 1, 426 (2000) ("*A* or *an* goes before a word or phrase denoting a person or thing (noun) but not a specific one. . . .  The definite article, *the*, . . . usually introduces a particular thing or individual group, one that was mentioned before or whose existence is known or presumed to be known.").  While context is always important and can often provide clarification, it's not a talisman that can be invoked to transform the ordinary functions of articles in English grammar.

34

Second, it must be observed that section 943.0435(1)(h)1 is a definitional statute. It so indicates right at the beginning of the subsection: " 'Sexual offender' means . . . ." For purposes of the crime of "sexual offenders" failing to register, we would expect to find the boundaries of the defined term "sexual offender" within the boundaries of the section that defines that term. *See generally Fla. Ins. Guar. Ass'n v. Bernard*, 140 So. 3d 1023, 1030 (Fla. 1st DCA 2014) ("[T]he definition of a term in the definitional section of a statute controls the construction of that term wherever it appears in the statute." (quoting *Durish v. Channelview Bank*, 809 S.W.2d 273, 276 (Tex. Ct. App. 1991))); *Fla. Dep't of Banking & Fin. v. Bd. of Governors of Fed. Res. Sys.*, 800 F.2d 1534, 1536 (11th Cir. 1986) ("It is an elementary precept of statutory construction that the definition of a term in the definitional section of a statute controls the construction of that term wherever it appears throughout the statute."). We should be exceedingly wary about straying beyond a statute's definitional section, notwithstanding the State's invitation to look elsewhere. *Cf.* Scalia & Garner, *Reading Law* at 228 ("It is very rare that a defined meaning can be replaced with another permissible meaning of the word on the basis of other textual indications; the definition is virtually conclusive."); Singer, *Statutes and Statutory Construction* 132 (7th ed. 2009) ("When a legislature defines the language it uses, its definition is binding upon the court even though the definition does not coincide with the ordinary meaning of the words.").

Third, it seems to us what the State would call legislative "context" ends up looking a great deal like "legislative intent." For example, we are told context requires us to consider various studies on recidivism, federal subsidy reporting requirements, and the filings of law enforcement agencies in response to *James*. These, according to the State, reveal "the

35

purposes of the law," which happen to align with the State's construction of section 943.0435(1)(h)1. But garlanding unwritten "purposes" over written statutory text is just another way of saying, "what the legislature *really* meant was . . . ."—and that kind of subtextual approach (in the truest sense of the word) is anathema to the supremacy-of-text rule. *Accord Tsuji*, 366 So. 3d at 1025; *Conage*, 346 So. 3d at 598; *Coates*, 365 So. 3d at 354; *Davis*, 339 So. 3d at 323.

Fourth, even if section 943.0435(1)(h)1 were read in a way that "the sanction imposed" wasn't a defined term (though it clearly is), the State's argument would have us ignore the plain and ordinary meaning of this term. *See Tsuji*, 366 So. 3d at 1028 ("Absent a legislatively supplied definition, we give the word 'liable' its 'plain and ordinary meaning' at the time of the statute's enactment, and we often look to contemporaneous dictionaries for evidence of that meaning." (citing *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Schs., Inc.*, 3 So. 3d 1220, 1233 (Fla. 2009))); *Westpark Preserve Homeowners Ass'n v. Pulte Home Corp.*, 365 So. 3d 391, 395 (Fla. 2d DCA 2023) ("When the legislature has not defined a term in the statute, courts may 'look to the dictionary in order to ascertain the plain and ordinary meaning of the term.' " (quoting *Debaun v. State*, 213 So. 3d 747, 751 (Fla. 2017))). In 1997, when this statute was enacted, Black's defined "the" as an article that "particularizes the subject which it precedes and is word of limitation as opposed to indefinite or generalizing force 'a' or 'an' ", "sanction" was defined broadly to mean "[p]enalty or other mechanism of enforcement used to provide incentives for obedience with the law", and "impose" meant "to levy or exact as by authority." *See The, Black's Law Dictionary* (6th ed. 1994). Thus, by the lights of the foremost legal dictionary's definitions, "the sanction imposed" means, as we said in *James*: *the* (not any)

*particularized* (not indeterminate from among a nonexhaustive list) *penalty* (not just incarceration) exacted by the authority of a criminal court.[11]

We can check this plain and ordinary definition against what the proverbial man or woman "on the street" would say. If he or she were told that a criminal defendant had been sentenced to prison, probation, and the payment of a fine and that proverbial person were then asked to describe what was "the sanction imposed" on that defendant, they would respond that the defendant had been imprisoned, was required to serve probation, and had to pay a fine. If that person were *then* told, no, actually "the sanction" was only the incarceration, they would probably wonder whether they'd been asked a trick question. *Cf. Pell v. State*, 122 So. 110, 113 (Fla. 1929) (construing criminal statute and observing that "[w]hen we come down to the sensible use of plain everyday language, such as the man on the street (who often becomes the man on the jury)

---

[11] The State's suggestion that the second sentence of section 943.0435(1)(h)1.a.(II)—"For purposes of sub-sub-subparagraph (I), a sanction imposed in this state or in any other jurisdiction includes, but is not limited to, a fine, probation, community control," etc.—"can effectively be superimposed into the first sentence without changing the first's meaning" amounts to a rather unsubtle linguistic sleight-of-hand, one that would not clarify, but radically transform the text we're trying to construe.

Besides which, when it says "[f]or purposes of sub-sub-subparagraph (I)," the second sentence is specifically pointing to a *different sub-sub-subparagraph altogether*, not the preceding sentence, and its nonexhaustive list of disjunctive potential penalties would be the antitheses of the particularizing use of the preceding sentence's definite article and meaning. The second sentence of (1)(h)1.a.(II) simply illustrates the kind of potential "sanctions" that could qualify for sexual offender registration; it leaves the work of who must register and when to the preceding sentence. That is how these two sentences are properly construed together.

uses and understands, and such as is used in our statute defining the different degrees of homicide . . . we lose nothing of substance, pith, or dignity, while we gain much in directness, lucidity, and simplicity of statement"); *United States v. Pate*, No. 20-10545, 2023 WL 6618405, * 3 (11th Cir. Oct. 11, 2023) ("[W]e 'ask how a reasonable person, conversant with the relevant social and linguistic conventions, would read the text in context.' " (quoting John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2392-93 (2003))).

Fifth and finally, if we were inclined to accept the State's construction of "the sanction imposed," it would, at most, amount to a valid, competing interpretation of the statute's text. We would then find ourselves with a "[r]un-of-the-mill ambiguity regarding particular applications of a criminal statute," *Martin v. State*, 259 So. 3d 733, 741 (Fla. 2018)—between the State's approach and *James*'—and the rule of lenity would compel us to follow *James* as the more lenient application. *See* § 775.021(1), Fla. Stat. (2019) ("The provisions of this code and offenses defined by other statutes shall be strictly construed; when the language is susceptible of differing constructions, it shall be construed most favorably to the accused."); *Cleveland v. United States*, 531 U.S. 12, 25 (2000) ("[W]e have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.' " (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971))); *J.J. v. State*, 181 So. 3d 522, 525 (Fla. 2d DCA 2015) ("It is a fundamental principle of Florida jurisprudence that penal statutes must be strictly construed.").

3.

Mr. Crose, who was still completing the probation portion of his criminal sanction, wasn't required to register as a sex offender at the time of his alleged offense under the operative, preamendment version of

section 943.0435. We, therefore, affirm the order of the circuit court dismissing this charge against him.

V.

As we acknowledged earlier, our holding today presupposes that the supremacy-of-text principle has supplanted the recent controversy rule. But if we're mistaken, if the recent controversy rule somehow retains some utility for construing the meaning of statutory text, we would still need to contend with several concerns this case raises. We will canvass those concerns in the following subsections and explain why these problems likewise preclude us from applying the amended statute's purported clarification to the case at bar.

A.

This is a criminal case. Both the federal and state constitutions generally forbid the ex post facto application of criminal laws. *See* art. I, § 9, cl. 3, U.S. Const. ("No Bill of Attainder or ex post facto Law shall be passed."); art. I, § 10, cl. 1, U.S. Const. ("No State shall . . . pass any . . . ex post facto law . . . ."); art. I, § 10, Fla. Const. ("No bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed."); *see also Collins v. Youngblood*, 497 U.S. 37, 43 (1990) ("Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts."); *Lescher v. Fla. Dep't of Highway Safety & Motor Vehicles*, 985 So. 2d 1078, 1081 (Fla. 2008) ("Both the United States and Florida Constitutions prohibit ex post facto laws."); *Rodriguez v. State*, 380 So. 2d 1123, 1123-24 (Fla. 2d DCA 1980) ("An ex post facto law, which is prohibited by [a]rticle I, [s]ection 10, Florida Constitution, is defined as '[o]ne which, in its operation, makes that criminal which was not so at the time the action was performed, of which increases the punishment, or, in short, which in relation to the

39

offense or its consequences alters the situation of a party to his disadvantage.' " (alteration in original) (quoting *Higginbotham v. State*, 101 So. 233, 235 (Fla. 1924))).[12]

---

[12] As Mr. Crose points out, there is a technical distinction in the constitutional analysis of retroactive legislation versus retroactive judicial decision-making. The former falls under the ex post facto clause, while the latter is governed by the due process provision of the Fifth Amendment, as applied to the States through the Fourteenth Amendment. As the Supreme Court explained:

> The Ex Post Facto Clause is a limitation upon the powers of the Legislature, *see Calder v. Bull*, 3 Dall. 386, 1 L.Ed. 648 (1798), and does not of its own force apply to the Judicial branch of government. *Frank v. Mangum*, 237 U.S. 309, 344, 35 S.Ct. 582, 593, 59 L.Ed. 969 (1915). But the principle on which the Clause is based the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties is fundamental to our concept of constitutional liberty. *See United States v. Harriss*, 347 U.S. 612, 617, 74 S. Ct. 808, 811, 98 L. Ed. 989 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453, 59 S. Ct. 618, 619, 83 L.Ed. 888 (1939). As such, that right is protected against judicial action by the Due Process Clause of the Fifth Amendment.

*See Marks*, 430 U.S. at 191-92.

Florida's recent controversy rule, however, is arguably a creature of both the legislature and the judiciary's making. After all, absent the impetus of a legislative amendment enacted in response to a controversy, a court can't invoke this tool of statutory construction; and the case at bar (in which the amendment at issue explicitly referenced our *James* decision, which the *Hull* panel then cited) exemplifies just how enmeshed the two branches can become when the rule is invoked.

Which constitutional provision the recent controversy rule implicates might pose an interesting question, but we need not linger too long on it. In the end, the two analyses—whether a legislature's enactment of a retrospective law violates the ex post facto clause or whether a court's retrospective application of legislation violates the due process clause—both revolve around the same center of gravity: a lack of fair notice. *See Lynce*, 519 U.S. at 441 ("We have explained that such [retroactive] laws implicate the central concerns of the *Ex Post Facto*

It is true, as we discussed in section III(A), that Florida courts have applied the recent controversy rule to construe criminal statutes notwithstanding ex post facto objections. *See, e.g., Leftwich*, 148 So. 3d at 84; *Hull*, 349 So. 3d at 464; *Burgos*, 765 So. 2d at 968. More often than not, the constitutional concern was assuaged by the assurance that all the court was doing was clarifying a criminal statute's intended meaning, not enlarging its operative scope.

Now one could argue (and some have) that that justification is nothing more than a fig leaf covering a retroactive application of a criminal statute. *See, e.g., Leftwich*, 148 So. 3d at 89 (Quince, J., dissenting) (maintaining that the statutory amendment at issue was "more than a mere clarification of the legislature's original intent," that "[t]his language supports the conclusion that the amendment expanded the exception to all habitual offenders," and that "[t]his expansion of the exceptions contained in the original statute results in the 1992 amendment being applied retroactively to Leftwich"); *Hull*, 349 So. 3d at 466 (Atkinson, J., dissenting) ("In instances where the recent controversy rule is applied to give effect to a legislature's subsequent pronouncement of intent that is not supported by the version of the statute that was in

Clause: 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.' " (quoting *Weaver v. Graham*, 450 U.S. 24, 30 (1981))); *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964) ("[A]n unforeseeable judicial enlargement of a criminal statute, applied retroactively, *operates precisely like an ex post facto law*, such as Art. I, s 10, of the Constitution forbids. . . . If a state legislature is barred by the Ex Post Facto Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction." (emphasis added)). For convenient shorthand, we will refer to ex post facto application in this section in its broader sense to encompass the more general fair notice implications of due process.

effect at the time of its alleged violation, the rule is merely retroactivity by another name."). Regardless of how substantive the cover of "clarification" ever was, in the advent of *Ham* and *Conage*, a post hoc, extratextual source such as a subsequent amendment to a criminal statute, can no longer be a viable tool to derive textual meaning. Not when we are supposed to "strive to determine the text's objective meaning through 'the application of [the] text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text *at the time it was issued.*' " *Levy*, 326 So. 3d at 681 (alteration in original) (emphasis added) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* at 33); *see also Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021) ("When called on to resolve a dispute over a statute's meaning, this Court normally seeks to afford the law's terms their ordinary meaning at the time Congress adopted them." (citing *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067 (2018))); *Kleparek*, 634 So. 2d at 1148 ("[I]t has been wisely observed by a judge that a legislature—not identical in body as a previous one—might be logically hard pressed to say what the earlier legislature intended."). If the only way the recent controversy rule withstands ex post facto scrutiny in a criminal case is by acting as a means of clarifying intent and if that function has effectively been withdrawn—as we believe it has—then construing the text of a statute according to the words of the statute's future amendments winds up being "retroactivity by another name." *See Hull*, 349 So. 3d at 466 (Atkinson, J., dissenting).

Mr. Crose's case illustrates this point. Under the prior text of section 943.0435, he was not required to register as a sex offender—and, correspondingly, could not be guilty of the third-degree felony of failing to do so—until he was released from "the sanction imposed" in his prior

42

sentence, a sanction that included probation. He could, however, be guilty of this charge if the text of the statute had required his registration following the release of the incarcerative portion of his criminal sanction, which is precisely what the amendments to section 943.0435 effectuated. To construe the preamendment statute in the manner the State suggests (that is, to align the preamended version's operation with the postamended version's text) violates the cardinal prohibition of ex post facto criminal laws: it criminalizes what had been noncriminal conduct after-the-fact. *See Carmell v. Texas*, 529 U.S. 513, 524-25 (2000).

B.

If a subsequent legislature's enactments can somehow inform a supremacy-of-text's construction of a prior legislature's laws, we would also have to contend with a lurking separation of powers issue. And here as well, the case at bar brings that dilemma into its fullest light.

Article II, section 3 of the Florida Constitution provides: "The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches expressly provided herein." "[T]he Florida Constitution imposes a 'strict' separation of powers requirement that applies just as vigorously to the judicial branch as it does to the other two branches of government." *Citizens for Strong Schs., Inc. v. Fla. State Bd. of Educ.*, 232 So. 3d 1163, 1170 (Fla. 1st DCA 2017) (quoting *State v. Cotton*, 769 So. 2d 345, 352 (Fla. 2000)). While there are occasions when the dividing lines between the branches' powers may seem blurred, basic judicial interpretation of the law is not one of them.

"It is emphatically the province and the duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177

43

(1803). There can be no question but that the interpretation of legislative acts in disputed cases lies at the very core of the judiciary's duty. *See, e.g., Bush v. Schiavo*, 885 So. 2d 321, 330 (Fla. 2004) ("Under the express separation of powers provision in our state constitution, 'the judiciary is a coequal branch of the Florida government vested with the sole authority to exercise the judicial power' . . . ." (quoting *Chiles v. Child. A, B, C, D, E, & F*, 589 So. 2d 260, 268-69 (Fla. 1991))); *Fla. Dep't of Revenue v. Fla. Mun. Power Agency*, 789 So. 2d 320, 324 (Fla. 2001) ("A court's function is to interpret statutes as they are written and give effect to each word in the statute."); *Getzen v. Sumter County*, 103 So. 104, 105 (Fla. 1925) ("In order that the state government may be one of legal regulations lawfully administered, the Constitution provides for a law enacting power, a law executing power, and also for a law interpreting power, i.e., the judicial power."). It is equally inarguable that that function encompasses the power of superior tribunals to review the rulings of lower courts within their jurisdiction—a power expressly conferred to those tribunals by our constitution. *See* art. V, § 3(b)(3), Fla. Const. ("The supreme court . . . may review any decision of a district court of appeal that expressly declares valid a state statute, or that expressly construes a provision of the state or federal constitution, or that expressly affects a class of constitutional or state officers, or that expressly and directly conflicts with a decision of another district court of appeal or of the supreme court on the same question of law."); § 4(b)(1) ("District courts of appeal shall have jurisdiction to hear appeals, that may be taken as a matter of right, from final judgments or orders of trial courts . . . not directly appealable to the supreme court or a circuit court.").

44

When implemented, though, the recent controversy rule shunts that interpretive power over to the legislative branch. For it both facilitates and effectuates an alternative form of judicial review by the legislature. Of course, the legislature is generally free to change the law in such a way that its *prospective* application will contravene a prior judicial interpretation of the prior law. But the recent controversy rule, through the guise of clarification, accomplishes much more than that.

The closing lines of *Madison at Soho* and *Hull* give away the game. In both cases, we deemed a legislative amendment to have "abrogated" one of our prior holdings. *See Hull*, 349 So. 3d at 465 ("Recognizing—as we must—the legislature's abrogation of *James* . . . ."); *Madison at Soho*, 198 So. 3d at 1119 ("The legislature abrogated our interpretation of section 718.116(3) in *St. Croix Lane Trust*."). The effect of those "abrogations," however, was completely retrospective; otherwise binding precedent was swept aside, as if it never existed, so that a panel could reconsider and then reconstrue the interpretation of a statute under the guidance of a legislative session that didn't exist when the operative statute was in effect. *Cf. Hull*, 349 So. 3d at 464 n.6 ("[W]e, too, find the recent controversy rule—by which a subsequent legislature's amendment somehow slips free from the bonds of time to recalibrate the meaning of the words that a prior legislature enacted—both puzzling in its application and potentially troubling in its effect.").

In essence, the recent controversy rule enables the legislature (or, more accurately, one particular legislative session) to act as a surrogate court of review. That is not a role for the legislature to assume in the system established under our state constitution. *See* art. V, § 3(b)(3), Fla. Const. If the *James* panel's interpretation of the prior version of section 943.0435 was incorrect, it would be the function of this court

45

proceeding en banc or the Florida Supreme Court to declare it so. That would be an interpretive correction, and interpretation of the law, as we've already discussed, is uniquely vested to the judiciary under our constitution. *Cf. Trs. of Internal Imp. Fund v. Bailey*, 10 Fla. 238, 251 (1863) (observing that the legislature's "province is to set the machinery of the rights of property in motion, but they have not the power of determining those rights" and that "[t]he latter is left to the judiciary, who are independent of the other branches of the government").[13]

## C.

It could be argued that the legislature's assumption of a reviewing court's role under the aegis of the recent controversy rule passes separation of powers muster because the rule is only ever applied by a court. Assuming that's true (by ignoring the legislature's essential role in the recent controversy rule's operation), we would then have to contend with yet another problem this rule raises. When a panel of an appellate court invokes the rule to reassess a prior panel's opinion in light of a legislative amendment (as this court did in *Hull* and *Madison at Soho*), we have a situation where one three-judge panel is effectively overruling another.

It is well settled in Florida that a three-judge panel of a district court of appeal is not at liberty to overrule or recede from a prior panel's

_____

[13] Apart from the legislative intrusion into judicial review, the recent controversy rule may also encourage a reciprocal incursion by the courts into the domain of the legislature. As Judge Atkinson observed, "[b]y applying something that was not the duly enacted law of the land at the time of the commission of the alleged crime, this court—even if at the urging of a subsequent legislature—would be *making* law, a law that *did not exist* at the time of the alleged offense." *Hull*, 349 So. 3d at 471 (Atkinson, J., dissenting); *see also Brown v. State*, 358 So. 2d 16, 20 (Fla. 1978) ("The Florida Constitution requires a certain precision defined by the legislature, not legislation articulated by the judiciary.").

controlling decision on the same point of law. *See, e.g., Wood v. Fraser*, 677 So. 2d 15, 18 (Fla. 2d DCA 1996) ("More important, because *Arango* was the opinion of a three-judge panel, that panel, consistent with the long-standing policy of this court, would not have receded from *Moore,* even if it were inclined to do so, without first seeking en banc consideration from the full court pursuant to Florida Rule of Appellate Procedure 9.331."); *Nat'l Med. Imaging, LLC v. Lyon Fin. Servs., Inc.*, 347 So. 3d 63, 64 n.2 (Fla. 3d DCA 2020) ("Unless the Florida Supreme Court overrules a prior panel's decision, a subsequent panel of this Court is not free to disregard, and must follow, precedent of the prior panel."). The recent controversy rule has, at times, elided this foundational principle of how our appellate courts are supposed to work. *See, e.g., Hull*, 349 So. 3d 459; *Madison at Soho II*, 198 So. 3d 1111.

We've found no Florida appellate court opinion that has ever acknowledged, much less reconciled, this awkward facet of the recent controversy rule's application. The "abrogation" discussed in the prior subsection doesn't wave the problem away. If the legislature can't act as a court of review, it follows that the only organic authority for abrogating a panel decision under the recent controversy rule is another panel's decision. Having considered the rule's effect more fully, we are now of the mind that if the recent controversy rule retains any vitality in the advent of *Ham* and *Conage* (and, again, we don't think it does), and if the rule's application in a case would effectively reverse, recede from, or declare a prior panel's decision abrogated on the same point of law, then only the court sitting en banc can apply the rule. For this reason as well, we would recede from *Hull* and *Madison at Soho* insofar as they represented an improper arrogation of en banc authority by a three-judge panel of the court.

47

## VI.

We hold that the recent controversy rule—in which a court considers subsequent legislative amendments to construe the meaning of prior statutory text—is no longer a viable method of construing statutory text in the wake of the Florida Supreme Court's decisions in *Ham* and *Conage*.[14]  We recede from *Hull* and *Madison at Soho* to the extent that both of those decisions rested on the recent controversy rule's authority.

---

[14] In his concurring in result only opinion, our colleague Judge Atkinson now chides us for addressing the arguments Mr. Crose and the State have made in these en banc proceedings while laboring to sketch out a novel proposition about "methodological precedent" no one in this litigation has ever suggested.  *See Miami-Dade County v. Omnipoint Holdings, Inc.*, 863 So. 2d 195, 200 (Fla. 2003) ("Ordinarily an appellate court does not give consideration to issues not raised below." (quoting *Hormel v. Helvering*, 312 U.S. 552, 556 (1941))).  According to our colleague, *Conage* wasn't especially remarkable because supreme court decisions in the two years prior to its issuance had already begun citing the supremacy-of-text principle when interpreting statutes.  We've already discussed, at length, the evolution in the case law leading up to *Conage*.  In our view, Judge Atkinson's assessment of *Conage* fails to reckon with what *Conage* said and what it did.

*Holly*, 450 So. 2d 217, was a seminal case of statutory interpretation in Florida law for nearly forty years, having been cited, applied, and followed in over 600 published opinions before *Conage*'s issuance.  *Conage* did not simply clarify *Holly* (as Judge Atkinson's opinion seems to imply).  *Conage* abrogated the most oft-cited features of *Holly*'s holding.  *See Conage*, 346 So. 3d at 598 ("[W]e address a threshold issue about Florida's law of statutory interpretation.  The United States encourages us to use an approach that is often linked to a passage from our Court's decision in *Holly v. Auld*, 450 So. 2d 217, 219 (Fla. 1984) . . . .  We believe that the *Holly* principle is misleading and outdated. . . .  It would be a mistake to think that our law of statutory interpretation requires interpreters to make a threshold determination of whether a term has a 'plain' or 'clear' meaning in isolation . . . .").  Thus, our analysis of *Conage*'s displacement of *Holly* is not an "artificial line of demarcation"; it is a reflection of the fact that arguments and issues do not come before our court in an ether, but at temporal points in the law's evolution.  *Holly*'s pronouncements that a statute's text only serves to

48

We return to the textual interpretation *James* gave the prior version of section 943.0435. At the time of Mr. Crose's alleged offense, he was required to register as a sex offender following his release from "the sanction imposed," not just a single part of the sanction. Because probation was part of Mr. Crose's sanction and he was still serving that probation at the time of his alleged offense, the circuit court correctly dismissed this charge. *See James*, 298 So. 3d at 94.

Having so held, we acknowledge that our decision today calls into question the continued effect of certain portions of supreme court precedents, including *Lowry*, *Lanier*, and *Leftwich*. We, therefore, certify the following question of great public importance to the Florida Supreme Court pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v):

> CAN A COURT CONSIDER A CRIMINAL STATUTE'S SUBSEQUENT AMENDMENTS TO CLARIFY A PRIOR VERSION OF THE CRIMINAL STATUTE CONSISTENT WITH THE SUPREMACY-OF-TEXT PRINCIPLE SET FORTH IN *HAM V. PORTFOLIO RECOVERY ASSOCIATES*, 308 SO. 3D 942, 946 (FLA. 2020), AND *CONAGE V. UNITED STATES*, 346 SO. 3D 594 (FLA. 2022)?

We have answered the question in the negative and affirm the order below accordingly.

Affirmed; question certified.


SLEET, C.J., and NORTHCUTT, CASANUEVA, KHOUZAM, ROTHSTEIN-YOUAKIM, and LABRIT, JJ., Concur.
SILBERMAN, J., Concurs specially with an opinion in which LABRIT, J., Concurs.

---

illuminate a separate, subtextual intention and that, before relying on canons of interpretation, statutes must be examined for ambiguity have now been formally displaced. We have endeavored to resolve the issues that have been argued in this proceeding, as best as we are able, in the light of that displacement.

LaROSE, J., Concurs in result only with an opinion in which KELLY, VILLANTI, MORRIS, BLACK, and SMITH, JJ., Concur.
ATKINSON, J., Concurs in result only with opinion.

SILBERMAN, J., Specially concurring.

I fully concur with the majority opinion and write solely to expand on footnote 10, which mentions the State's concession that the absurdity doctrine does not apply here. In our order granting the State's motion to allow en banc briefing, we directed the parties to address "[w]hether the 'absurdity doctrine' applies and compels a particular outcome. *See State v. Lewars*, 259 So. 3d 793, 800 (Fla. 2018); *Maddox v. State*, 923 So. 2d 442, 447-48, 453 (Fla. 2006)."

In *Maddox*, the Florida Supreme Court explained the absurdity doctrine, stating that "although the strict meaning of the words in the abstract employed by the Legislature when it drafted" a statute may support a particular outcome, "such a sterile literal interpretation should not be adhered to when it would lead to absurd results." 923 So. 2d at 448; s*ee also Raik v. Dep't of Legal Affs., Bureau of Victim Comp.*, 344 So. 3d 540, 549 (Fla. 1st DCA 2022) ("In certain circumstances, the absurdity doctrine may be used to justify departures from the general rule that courts will apply a statute's plain language." (quoting *State v. Hackley*, 95 So. 3d 92, 95 (Fla. 2012))). In *Lewars*, the Florida Supreme Court reiterated that a statute need not be given a literal interpretation when doing so would result in an unreasonable or ridiculous conclusion; however, the absurdity doctrine should not be used in circumstances which require a court to rewrite a statute instead of to correct a technical or ministerial error. 259 So. 3d at 800-01.

Here, neither party argued that the absurdity doctrine should apply. The State responded to our order, asserting that the doctrine does

50

not apply "but the related concept of construing a law consistent with its evident purpose does."  The State maintained that the absurdity "doctrine allows a court to deviate from the otherwise plain meaning of a text only 'if failing to do so would result in a disposition that no reasonable person could approve,' " quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 234 (2012), and citing to *Lewars*, 259 So. 3d at 800-02.  Unsurprisingly, Mr. Crose also responded that the absurdity doctrine does not apply here, relying on his argument that the trial court correctly analyzed the statutory language.

Still, it is not clear what policy reasons would support the conclusion that a sex offender who is released from prison would not be required to register and provide information as required by section 943.0435 until all portions of the offender's sanction, such as the payment of fines or completion of probation, are satisfied.  But because neither party contends that the absurdity doctrine should apply, the majority opinion correctly declines to further analyze the doctrine.  When the State has explicitly declined to make an argument, we will not act as the State's advocate.  *See Burke v. Burke*, 330 So. 3d 84, 86 (Fla. 2d DCA 2021) ("This Court will not depart from its dispassionate role and become an advocate by second guessing counsel and advancing for him theories and defenses which counsel either intentionally or unintentionally has chosen not to mention." (quoting *Polyglycoat Corp. v. Hirsch Distribs., Inc.*, 442 So. 2d 958, 960 (Fla. 4th DCA 1983))), *review denied*, No. SC22-82, 2022 WL 1566687 (Fla. May 18, 2022); *see also Braddy v. State*, 219 So. 3d 803, 825 (Fla. 2017) ("But Braddy fails to make any argument regarding these claims on appeal.  Accordingly, Braddy has waived any issue on appeal regarding these claims."); *Menchillo v. State*, 350 So. 3d 136, 139 n.1 (Fla. 2d DCA 2022) ("An appellate court is 'not at liberty to

51

address issues that were not raised by the parties.' . . . For an appellant to raise an issue properly on appeal, he must raise it in the initial brief. Otherwise, issues not raised in the initial brief are considered waived or abandoned." (quoting *Rosier v. State*, 276 So. 3d 403, 406 (Fla. 1st DCA 2019) (en banc))).

LABRIT, J., Concurs.


LaROSE, J., Specially concurring in result only.

I concur in the result reached by the majority. Because Mr. Crose had not been released from his entire sanction, *see* § 943.0435(1)(h)1, Fla. Stat. (2019); *State v. James*, 298 So. 3d 90, 92 (Fla. 2d DCA 2020), the trial court order is properly affirmed.

The majority offers a thoughtful and thorough examination of the supremacy-of-the-text doctrine and the recent controversy rule. Respectfully, however, I believe that the majority poses a false choice. To my mind, the majority needlessly jettisons the recent controversy rule as so much jetsam. Because of the supremacy-of-the-text doctrine, the majority, in my view, seemingly concludes that the recent controversy rule no longer holds sway. As Justice Kagan once remarked, "we are all textualists." Harvard Law School, *The Antonin Scalia Lecture Series: A Dialogue with Justice Elena Kagan on the Reading of Statutes*, YouTube (Nov. 25, 2015) https://www.youtube.com/watch?v=dpEtszFT0Tg.

Maybe so; but on the record before us, I see no need to make the choice offered by the majority. The statute under which the State charged Mr. Crose is clear and unambiguous. Consequently, courts should "not look behind the statute's plain language for legislative intent or resort to rules of statutory construction to ascertain intent."

52

*Kasischke v. State*, 991 So. 2d 803, 807 (Fla. 2008) (alteration in original) (quoting *Borden v. E. Eur. Ins. Co.*, 921 So. 2d 587, 595 (Fla. 2006)).  The supremacy-of-the-text doctrine compels affirmance.  *See, e.g., Savona v. Prudential Ins. Co. of Am.*, 648 So. 2d 705, 707 (Fla. 1995) ("Because the language of the statute is clear, we do not look beyond it to discern legislative intent."); *Dean Wish, LLC v. Lee County*, 326 So. 3d 840, 850 (Fla. 2d DCA 2021); *Ellsworth v. State*, 89 So. 3d 1076, 1078 (Fla. 2d DCA 2012) ("When the statutory language is clear, courts may not explore legislative history nor apply canons of statutory construction."); *Fla. Retail Fed'n, Inc. v. City of Coral Gables*, 282 So. 3d 889, 895-96 (Fla. 3d DCA 2019) ("There is no need to resort to rules of statutory construction because the statutory text is clear."), *review denied,* No. SC19-1798, 2020 WL 710303 (Fla. Feb. 12, 2020).  Our work is done.

Although I appreciate the majority's efforts to resolve an apparent conundrum that has, by all accounts, bedeviled many Florida courts, Mr. Crose's case, quite simply, does not compel us to trek down a path we need not tread.  *See* Amy Coney Barrett, *Substantive Canons and Faithful Agency*, B.U. L. Rev, 109, 112 (2010) ("The rival theories [of statutory interpretation] in this regard were - and remain - purposivism and textualism.  Purposivism, the classical approach to statutory interpretation, claims that a judge should be faithful to Congress's presumed intent rather than to the statutory text when the two appear to diverge.  Textualism, by contrast, maintains that the statutory text is the only reliable indication of congressional intent.  The defining tenet of textualism is the belief that it is impossible to know whether Congress would have drafted the statute differently if it had anticipated the situation before the court.  The legislative process is path-dependent and riddled with compromise." (footnote omitted)).

53

I cannot ignore the fact that the legislature amended section 943.0435 after *James*. The State urges us to apply the amended statute because it reflects the legislature's true intent. *See* ch. 2021-156, § 1, Laws of Fla. ("The Legislature intends that a person must register as a sexual offender pursuant to s. 943.0435, Florida Statutes, when he or she has been convicted of a qualifying offense and, on or after October 1, 1997, has . . . [b]een released from a sanction imposed upon conviction."). After all, our supreme court informs us that "[c]ourts may look to a statutory amendment as clarification of the legislature's 'intent behind the prior version of the statute.' " *Dean Wish, LLC*, 326 So. 3d at 850 (quoting *Leftwich v. Fla. Dep't of Corr.*, 148 So. 3d 79, 83-84 (Fla. 2014))). That precedent remains undisturbed. *Id.* I would not be so bold as to conclude that our supreme court abandoned the recent controversy rule sub silentio. *See Puryear v. State*, 810 So. 2d 901, 905-06 (Fla. 2002) ("We take this opportunity to expressly state that this Court does not intentionally overrule itself sub silentio. Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding. Where this Court's decisions create this type of disharmony within the case law, the district courts may utilize their authority to certify a question of great public importance to grant this Court jurisdiction to settle the law."); *cf.* Christopher J. Baldacci, *The Common Law of Interpretation*, 108 Virginia L. Rev. 1243, 1245 (2022) ("For many years, judges and scholars have agreed there is no such thing as 'methodological stare decisis.' No Supreme Court majority opinion purports to require that future justices be textualists or purposivists. Nor does one majority's decision to use a particular

54

extrinsic source (like dictionaries or drafting history) seem to mean that future courts must do the same. Thus, while a given case may stand for any number of legal propositions, each court supposedly writes on a blank methodological slate." (footnote omitted)).

The recent controversy rule is no more than an interpretive tool in a court's toolbox to discern statutory meaning. But a court should not apply the rule in a wooden fashion. Indeed, our supreme court urges caution. A legislature cannot retroactively nullify the clear and unambiguous language used by a prior legislature to express its current intent. *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins.*, 945 So. 2d 1216, 1230 (Fla. 2006) (recognizing that the Florida Supreme Court has "been reluctant to look at subsequent amendments to determine legislative intent when the language of a statute is clear and unambiguous"); *Kaisner v. Kolb*, 543 So. 2d 732, 738 (Fla. 1989) ("Subsequent legislatures, in the guise of 'clarification,' cannot nullify retroactively what a prior legislature clearly intended.").

This is particularly important for Mr. Crose. The State's position presents serious concerns about ex post facto laws, laws prohibited by our national and State constitutions. *See* art. I, § 10, cl. 1, U.S. Const.; art. I, § 10, Fla. Const. Even in the civil context, unrestrained application of the recent controversy rule could impair contractual obligations undertaken pursuant to a clear and unambiguous statute. *Cf. Fla. Ins. Guar. Ass'n v. Devon Neighborhood Ass'n*, 67 So. 3d 187, 195 (Fla. 2011) ("The presumption against retroactive application is a well-established rule of statutory construction that is appropriate in the absence of an express statement of legislative intent because 'a presumption against retroactivity will generally coincide with legislative

and public expectations.' " (quoting *Arrow Air, Inc. v. Walsh*, 645 So. 2d 422, 425 (Fla. 1994))).

The statute before us is clear and unambiguous. Thus, the text compels the majority's result. Having said that, however, I cannot conclude that there can never be a place for the recent controversy rule. To say it again, the rule is a tool of interpretation.

One may imagine a situation where a statutory text is less than clear. *See, e.g.*, *Kasischke*, 991 So. 2d at 807 (determining, in five-to-two vote that "[t]he plain language of the statute could be construed in at least four ways," while the two dissenting justices, writing separately, asserted that the plain meaning of the statute was unambiguous). All must agree that "[s]ince words, by their nature, are imprecise instruments, . . . [statutes] . . . may have gray areas at the margins." *United States v. Barnes*, 295 F.3d 1354, 1366 (D.C. Cir. 2002) (quoting *U.S. v. Nason*, 269 F.3d 10, 22 (1st Cir. 2001)). A panoply of interpretative tools is available to a reviewing court. *See* Karl N. Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons about how Statutes are to be Construed*, 3 Vand. L. Rev. 395, 401-06 (1950) (listing a variety of canons for statutory construction). It seems to me that a court could look to postenactment amendments as one clue to discern the meaning of unclear and/or ambiguous text. *See, e.g., D & T Props., Inc. v. Marina Grande Assocs.*, 985 So. 2d 43, 48 (Fla. 4th DCA 2008) (reasoning that the statutory amendments "did not nullify the plain language of earlier legislation" where "[t]he legislation clarified an ambiguity in earlier legislation").

A minimalist approach to the law is prudent. I would affirm the trial court's order based on the supremacy-of-the-text doctrine. I would recede from *Hull* and *Madison at Soho* to the extent they suggest that the

recent controversy rule may be applied to otherwise clear and unambiguous statutory text. Delving further into the continuing vitality of the recent controversy rule takes us well beyond what we need to do. This I cannot abide. *See PDK Lab'ys, Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) (observing that judicial restraint cautions that when "it is not necessary to decide more, it is necessary not to decide more").

KELLY, VILLANTI, MORRIS, BLACK, and SMITH, JJ., Concur.


ATKINSON, Judge, Concurring in result.

I concur in the result reached by the majority. The recent controversy rule is incompatible with our role as members of the judiciary, which, when it comes to the interpretation of legal texts, requires us to apply the language in accordance with the ordinary meaning of the words in their context.

> To the extent [the recent controversy rule] is employed in abrogation of the meaning of the text of a pre-amendment version of a statute, the rule is inconsistent with our charge as members of the judicial branch. "In determining the meaning of a statute, we adhere to the supremacy-of-the-text principle—a principle recognizing that '[t]he words of a *governing* text are of paramount concern, and what they convey, in their context, is what the text means.' " *Levy v. Levy*, 326 So. 3d 678, 681 (Fla. 2021) (alteration in original) (emphasis added) (quoting *Page v. Deutsche Bank Tr. Co. Ams.*, 308 So. 3d 953, 958 (Fla. 2020)); *CCM Pathfinder Palm Harbor Mgmt., LLC v. Unknown Heirs of Gendron*, 198 So. 3d 3, 9 (Fla. 2d DCA 2015) ("[I]t is this court's role to apply the law as written . . . .").

*Hull v. State*, 349 So. 3d 459, 467 (Fla. 2d DCA 2022) (Atkinson, J., dissenting). A failure to carry out this role by applying the recent controversy rule would jeopardize the rule of law because we would be

substituting what the text says with what we conclude it should say based on a subsequent pronouncement of legislative intent. *See id.* (Atkinson, J., dissenting) ("The majority relies on the recent controversy rule to improperly implement a retroactive change to the plain and ordinary meaning of the text of a statute as it read at the time of the alleged crime. The plain and ordinary meaning of the language of the statute in context, as it would be understood when it was enacted, is the law. Courts may not apply the law in derogation of that meaning." (citations omitted)); *cf. State v. Peraza*, 259 So. 3d 728, 733 (Fla. 2018) ("Because even a clearly discernible Legislative intent cannot change the meaning of a plainly worded statute, it would only confuse matters to focus on what the Legislature might have intended rather than what the statute actually says."). And it would violate the constitution's separation of powers requirement because we would be supplanting the text enacted by the legislature that passed the law with something enacted at a later time—ignoring the meaning of language employed by the legislative branch in favor of a meaning derived from an extraneous source. *See Hull*, 349 So. 3d at 465, 468 (Atkinson, J., dissenting). For these reasons, the recent controversy rule should have no application in Florida jurisprudence.

Yet it does. As the majority points out, the recent controversy rule has a long history of usage by Florida appellate courts. In this court's most recent discussion of the rule, the majority in *Hull* considered itself bound to follow the rule. *See id.* at 464, 464 n.6 (majority opinion) (concluding that "we are bound to consider the legislature's clarified intent" under the recent controversy rule because it is a "settled facet of the law in our State"). I dissented and avoided the question of whether the recent controversy rule is precedential because prior cases

58

construing the rule from the supreme court and this court were inapposite. *See id.* at 465 (Atkinson, J., dissenting) ("This court is not bound by precedent to apply the rule under the circumstances of this case . . . ."). While the majority in this case avoids directly resolving the dichotomy it frames between the rule being "discretionary" or "quasi-mandatory," it tacitly concludes that the rule is binding precedent because it employs another purportedly binding doctrine to overrule it. I find common cause with much of the criticism leveled in the majority opinion against the recent controversy rule. However, I am unable to join in the effort to drive a stake in the heart of the doctrine because the logic employed by the majority to effect the doctrine's demise is flawed.

The majority's reason for overruling the recent controversy rule is what it characterizes as a "recent embrace" of the supremacy-of-text principle for interpreting statutes, characterizing the embrace as so significant that it constitutes a "paradigm shift in Florida law." The majority reasons that the paradigm shift, combined with the Florida Supreme Court's *Conage* decision, has rendered the recent controversy rule incompatible with this new regime and resulted in the Florida Supreme Court overruling the recent controversy rule sub silentio. While it is reasonable to observe that a paradigmatic shift has occurred, it is a separate question whether this recent "embrace" constitutes binding precedent that overruled past decisional law implementing the recent controversy rule such that the interpretive method is thenceforth unavailable to all inferior court judges—as is the question of *at what point in time*, if ever, this overruling occurred. The majority then contends that even if the recent controversy rule was not overruled, the shift in statutory interpretation now gives life to previously inapplicable

59

constitutional concerns of ex post facto laws and due process violations. *See infra* note 16.

It is inaccurate to describe the supreme court's "embrace" of the supremacy-of-text principle as "recent" when that approach to the interpretation of legal texts had already been espoused in several opinions of the supreme court at the time *Hull* was decided in 2022. *See Sheffield v. R.J. Reynolds Tobacco Co.*, 329 So. 3d 114, 119 (Fla. 2021); *Levy*, 326 So. 3d at 681; *Page*, 308 So. 3d at 958; *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946–47 (Fla. 2020); *Advisory Op. to Governor re Implementation of Amend. 4, the Voting Restoration Amend.*, 288 So. 3d 1070, 1078 (Fla. 2020). The majority even cites case law predating *Hull* for the proposition that the supreme court "has *now* instructed us to 'follow the supremacy-of-text principle.' " (Emphasis added) (quoting *Ham*, 308 So. 3d at 946). If the recent controversy rule was available as an interpretive tool at the time *Hull* was decided by virtue of the supreme court's past usage of the rule, then it follows that the supremacy-of-text principle was also available as an interpretive tool at the time *Hull* was decided. *See Hull*, 349 So. 3d at 467–68 (Atkinson, J., dissenting) (contending that the application of the recent controversy rule would violate "the supremacy-of-the-text principle" (quoting *Levy*, 326 So. 3d at 681)). Yet, at a time when several Florida Supreme Court opinions had been decided *based on* the *supremacy*-of-text principle, the majority in *Hull* decided that the recent controversy rule should be applied in *derogation of* the text. *See id.* at 464 n.6 (majority opinion) (conceding that this court correctly interpreted the preamendment statutory text in *James* but nevertheless applying a different interpretation under the recent controversy rule). Manifestly, the

60

putative "incompatibility" between the two doctrines claimed by the majority in this case was extant at the time *Hull* was decided.

To be clear, I do not argue that the two doctrines are *not* incompatible; to the contrary, when a judge seizes upon what he or she perceives as some indicia of legislative intent and favors it over the ordinary meaning of the text of the document being interpreted, the legislative-intent-as-polestar method and the supremacy-of-text principle are irreconcilable. It was for parallel reasons that I asserted in my dissenting opinion in *Hull* that the recent controversy rule—which is itself, to paraphrase the majority's astute observation, premised on the supremacy of legislative intent—is incompatible with the supremacy-of-text philosophy. Indeed, two competing things cannot both be *supreme* when they are in conflict. And yet, even according to the majority's rationale for the disparate treatment of the recent controversy rule in *Hull* and this case, both the legislative-intent-as-polestar methodology and the supremacy-of-text principle had been espoused by, and formed the basis of, supreme court decisions in the era that persisted up until the *Conage* case was decided. *See, e.g., Ham*, 308 So. 3d at 946 ("In interpreting the statute, we follow the 'supremacy-of-text principle'— namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.' " (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012))); *McCloud v. State*, 260 So. 3d 911, 914 (Fla. 2018) (reasoning the purpose of statutory interpretation "is to effectuate the Legislature's intent because 'legislative intent is the polestar that guides a court's statutory construction analysis.' " (quoting *State v. J.M.*, 824 So. 2d 105, 109 (Fla. 2002))). The explanation for this coexistence of incompatible interpretive methodologies is not perplexing

(and indeed is not historically atypical) if one considers the methodologies as merely competing tools of interpretation rather than binding precedential pronouncements of the high court. Because the majority takes the latter view, a line of demarcation was logically necessary to justify the disparate treatment of the recent controversy rule as it was applied in the *Hull* decision and in this case.

As discussed, the unignorable volume of pre-*Hull* Florida Supreme Court decisions relying on the supremacy-of-text principle poses a challenge for the majority's rationale. *See, e.g.*, *Sheffield*, 329 So. 3d at 119; *Levy*, 326 So. 3d at 681; *Page*, 308 So. 3d at 958; *Ham*, 308 So. 3d at 946–47; *Advisory Op. to Governor re Implementation of Amend. 4*, 288 So. 3d at 1078. The majority attempts to elide this chronological problem by citing the post-*Hull* decision of *Conage v. United States*, 346 So. 3d 594 (Fla. 2022), as a fulcrum point for the proposition that the supreme court "unequivocally abandoned the legislative intent approach [to statutory interpretation] emblemized in *Holly* [*v. Auld*, 450 So. 2d 217 (Fla. 1984)]." However, in *Conage*, the supreme court took issue with only the following sentence from the *Holly* decision: "When the language of the statute is clear and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction." *Conage*, 346 So. 3d at 598 (quoting *Holly*, 450 So. 2d at 219). The supreme court reasoned that, "[i]n practice, following this maxim often leads the interpreter to focus on a disputed word or phrase in isolation; [and] the maxim also leaves the interpreter in the dark about how to determine whether a particular word or phrase has a clear meaning." *Id.* The supreme court consequently labeled the aforementioned "*Holly* principle" as "misleading and

outdated," and reaffirmed supremacy-of-text principles that it had already pronounced in at least seven prior decisions:

> [J]udges must exhaust all the textual and structural clues that bear on the meaning of a disputed text. That is because the plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.

> . . . It would be a mistake to think that our law of statutory interpretation requires interpreters to make a threshold determination of whether a term has a "plain" or "clear" meaning in isolation, without considering the statutory context and without the aid of whatever canons might shed light on the interpretive issues in dispute.

*Id.* (citations omitted) (first quoting *Alachua County v. Watson*, 333 So. 3d 162, 169 (Fla. 2022); then quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see Lab'y Corp. of Am. v. Davis*, 339 So. 3d 318, 323 (Fla. 2022) (explaining that, under the supremacy of text principle, one looks to the words and the context in which they are used); *Sheffield*, 329 So. 3d at 119 (same); *Levy*, 326 So. 3d at 681 (same); *State v. McKenzie*, 331 So. 3d 666, 670–71 (Fla. 2021) (same); *Page*, 308 So. 3d at 958 (same); *Ham*, 308 So. 3d at 946–47 (same); *Advisory Op. to Governor re Implementation of Amend. 4*, 288 So. 3d at 1078 (same).

The majority overstates the *Conage* opinion. *Conage* solely addressed an often-cited principle from the supreme court's 1984 *Holly* decision that misled courts into analyzing the meaning of a disputed text in isolation without considering the context of that text. 346 So. 3d at 598. The supreme court concluded that courts are not limited to reviewing disputed words in isolation when determining whether they are clear or ambiguous and abrogated *Holly* to the extent it required courts to do so, instead authorizing courts to consider the disputed text, its

63

context, and any helpful canons of interpretation in evaluating whether a particular word or phrase has a clear meaning or is ambiguous. *Id.*

One need not minimize the undeniable importance of *Conage* to conclude that it had nothing to do with legislative intent and that there is no reasonable way to read the opinion to conclude that it abrogated an entire legislative-intent approach to statutory interpretation. By reaffirming that context is always relevant to interpreting legal texts and clarifying that ascertainment of the meaning of the text of a statute by resort to the canons of construction does not depend on a threshold determination of its ambiguity, *Conage* reaffirmed the supremacy-of-text principle that had already been pronounced on many prior occasions, including those predating this court's *Hull* decision. Nor was *Conage* an explicit repudiation of the proposition that the "polestar" of legislative intent was available to guide judges' interpretation of statutes, *see McCloud*, 260 So. 3d at 914, much less a sub silentio elimination of the recent controversy rule. As pernicious as the long-standing obeisance to the elusive concept of legislative intent might be to those who believe the text should be supreme in matters of statutory construction, *Conage* cannot be relied upon to eradicate all intent-based interpretive methods any more than it can be perceived as an eradication of the related but likewise long-standing availability of the recent controversy rule.

Eliding the arbitrariness of its selection of *Conage* as the demarcation between the era in which the recent controversy rule was mandatory and the new era in which the rule is now verboten, the majority protesteth too much, methinks, when it informs the reader that "it is not hyperbole to observe that *Conage*'s displacement of *Holly* and the supreme court's recent embrace of the supremacy-of-text principle constituted a paradigm shift in Florida law." The majority's selection of

*Conage* as the pertinent fulcrum point between one method of statutory interpretation and another to support its rationale cannot be justified as anything more than an arbitrarily drawn line in the shifting sand of interpretive jurisprudence.

Moreover, even if, for the sake of analysis, *Conage* could be considered a relevant line of demarcation, it is also difficult to conclude that the case overruled the recent controversy rule because it is not clear that the supremacy-of-text principle, a methodological precedent, is entitled to binding precedential effect under stare decisis. *See, e.g., Kisor v. Wilkie,* 139 S. Ct. 2400, 2444 (2019) (Gorsuch, J., concurring) ("[W]e do not regard statements in our opinions about such generally applicable interpretive methods, like the proper weight to afford historical practice in constitutional cases or legislative history in statutory cases, as binding future Justices with the full force of horizontal *stare decisis.*" (first citing Evan J. Criddle & Glen Staszewski, *Against Methodological Stare Decisis*, 102 Geo. L.J. 1573, 1577 & n.12 (2014); then citing Chad M. Oldfather, *Methodological Stare Decisis and Constitutional Interpretation, in* United States Supreme Court Precedent 135, 135–36 (Christopher J. Peters ed. 2013))); *Cabeda v. Att'y Gen. of U.S.,* 971 F.3d 165, 171 n.4 (3d Cir. 2020) ("[S]hifting interpretive methodologies are not usually viewed as carrying the force of stare decisis, at least not when the decisions employing them do not purport to overrule past precedent. We have noted that the Supreme Court 'typically avoids methodological stare decisis,' while observing that 'federal courts do not treat interpretive methodology as a traditional form of law.' " (citation omitted) (quoting *Am. Farm Bureau Fed'n v. U.S. E.P.A.,* 792 F.3d 281, 307 n.8 (3d Cir. 2015))).

In other words, inferior courts are arguably no more obligated to adhere to the supremacy-of-text principle espoused by current and recent members of the Florida Supreme Court than were inferior courts required to follow the legislative-intent-as-polestar philosophy that was espoused by past members of the Florida Supreme Court. I do not believe that inferior court judges were compelled to follow the "polestar" of "legislative intent," illuminated by the Florida Supreme Court during the era in which adherents to that methodology prevailed among its ranks. *See, e.g., McCloud*, 260 So. 3d at 914. If inferior court judges during that time could not in intellectual honesty bend to the notion that perceptions of legislative intent should be their guide because they in good conscience thought the text to be supreme, they were free to hew to the ordinary meaning of the text despite supreme court case law pronouncing that legislative intent should be paramount. Therefore, despite my belief that the supremacy-of-text principle is consistent with the proper role of judges in our tripartite system of government—and that a legislative-intent-as-polestar methodology is inconsistent with that role because of its propensity to subordinate the meaning of the text itself—I cannot conclude that supreme court opinions relying on the supremacy-of-text principle constitute binding precedent compelling inferior courts to forever and under all circumstances foreswear legislative intent as relevant to the interpretation of statutes.

> [M]ethodological decisions are frequently intertwined with a judge's most fundamental beliefs and commitments about the rule of law and democracy, and the application of stare decisis to interpretive methodology would in principle require judges to make what they view as unconscionable decisions. Once again, it is one thing to require judges to follow binding substantive rules with which they disagree, but it is another thing to require judges to follow higher-order rules that force them to make decisions on issues of first impression in a

66

manner that is contrary to their fundamental understanding of the role of federal courts in a constitutional democracy. It is hard to believe, for example, that Justice Scalia would agree to decide every future statutory case that comes before the Court in a purposive fashion merely because Justice Breyer was able to persuade a five-Justice majority to adopt this approach in the first case decided under a regime of methodological stare decisis.

Criddle & Staszewski, *supra*, at 1595 (arguing that "federal courts should resist the siren song of methodological stare decisis").

The legislative-intent-as-polestar philosophy that the majority observantly describes as regnant in a bygone era and the supremacy-of-text principle that it identifies as the now-prevailing method in light of recent supreme court case law share one thing in common: they are both methodological precedents of the variety that courts and commentators have historically considered to be outside the ambit of stare decisis. They are interpretive tools, the employment of which does not constitute binding precedent. *Cf. Kisor*, 139 S. Ct. at 2444 (Gorsuch, J., concurring) (identifying the "interpretive methodology" at issue as "an abstract default rule of interpretive methodology that settles nothing of its own force," "[i]n contrast to precedents that fix the meaning of *particular* statutes and generate reliance interests in the process" (emphasis in original)). That I and others celebrate the fall of the former and the rise of the latter as a salutary development in high court jurisprudence should not give way to the temptation to lock in perceived victories as something more than they are. That sword has two edges, and a welcome supreme court trend toward adherence to a fair reading of the text itself and away from slippery notions of legislative intent could easily be reversed in the future by the vicissitudes of court membership.

The same criticism against those interpretive methods as subject to stare decisis can arguably be leveled at the recent controversy rule

67

itself—that is, the rule is arguably methodological precedent that is not binding on subsequent panels or inferior courts. As I noted in my dissenting opinion in *Hull*, and as the majority in this case has acknowledged, this court and others have treated the recent controversy rule merely as an interpretive tool without binding precedential effect. *Cf. Hull*, 349 So. 3d at 466 (Atkinson, J., dissenting) (noting that "courts of this state have instead characterized the recent controversy rule as a method of statutory interpretation"); *see also Hardee County v. FINR II, Inc.*, 221 So. 3d 1162, 1167 (Fla. 2017) (referring to the evaluation of "amendments enacted shortly after controversies as to the interpretation of the original act" as a "tool[] of statutory interpretation"); *Dadeland Depot, Inc. v. St. Paul Fire & Marine Ins. Co.*, 945 So. 2d 1216, 1230 (Fla. 2006) (explaining that "it *may* be within this Court's *discretion* to look to the Legislature's recent amendment of section 624.155 to assist in construing the term 'insured' " (emphasis added)); *State v. Lanier*, 464 So. 2d 1192, 1193 (Fla. 1985) ("[W]e are not bound by statements of legislative intent uttered subsequent to either the enactment of a statute or the actions which allegedly violate the statute."); *Dean Wish, LLC v. Lee County*, 326 So. 3d 840, 850 (Fla. 2d DCA 2021) ("Because the Act's language before us is clear, we need not look at the 2021 amendment to discern a prior legislative intent."). But, as pointed out by the majority, the body of available case law also includes opinions that treat the recent controversy rule as mandatory precedent. *See, e.g., Hull*, 349 So. 3d at 464 n.6 (acknowledging the court's prior opinion in *James* correctly applied the preamendment text of the statute, but using the recent controversy rule to apply a different meaning because the rule is a "settled facet of the law in our State").

Admittedly, the argument for the supremacy-of-text principle and other methodological precedents as binding precedent is not completely bereft of merit—or appeal—and certainly not without its thoughtful and learned proponents (which, of course, include my colleagues in the majority of this case). *See, e.g.*, Aaron-Andrew P. Bruhl, *Eager to Follow: Methodological Precedent in Statutory Interpretation*, 99 N.C. L. Rev. 101, 102 (2020) (describing "the hope of [methodological precedent] advocates . . . that making interpretive methodology into binding law will reduce the much lamented unpredictability of statutory interpretation"). The Florida Supreme Court and some of its members have occasionally employed authoritative language when describing a preferred interpretive methodology, which such admonitions could be perceived as (or mistaken for) the setting of binding precedent. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Shands Jacksonville Med. Ctr.*, 210 So. 3d 1224, 1229 (Fla. 2017) ("[W]e *must* consider the statute as a whole, including the evil to be corrected, the language, the title, and history of its enactment, and the state of law already in existence on the statute." (emphasis added) (quoting *Fla. Dep't of Env't Protc. v. ContractPoint Fla. Parks, LLC*, 986 So. 2d 1260, 1266 (Fla. 2008))); *Metro. Cas. Ins. Co. v. Tepper*, 2 So. 3d 209, 215 (Fla. 2009) ("Because the plain language of section 627.727(6)(b) plainly states that an UM carrier 'is entitled to seek subrogation' only 'upon final resolution of the underinsured motorist claim,' we conclude that the statute is mandatory . . . . This result is supported by the plain language of the statute and our *precedent* on statutory interpretation." (emphasis added)); *Kasischke v. State*, 991 So. 2d 803, 824 n.27 (Fla. 2008) (Lewis, J., dissenting) ("Under *binding precedent*, legislative history—and specifically staff analyses—remain appropriate tools in discerning the intent of the Legislature. . . . The current majority opinion

attempts to alter this precedent through gradual subterfuge. I cannot take such a stance with regard to stare decisis unless and until the existing precedent is overruled." (emphasis added)). It is far from certain, however, that inferior courts are consequently obligated to—or even capable of—slavish adherence to the particular application of any of the interpretive methods employed in those cases and in the hierarchical order in which competing canons are applied, which themselves are not all sacrosanct but subject to realignment depending on the circumstances of each case. *See* Criddle & Staszewski, *supra*, at 1593 (" '[S]tatutory interpretation methodology does not seem susceptible to the rule-like approach of stare decisis' because it is fundamentally 'a web of considerations with different and varying weights rather than a set of hierarchical rules.' " (quoting Connor N. Raso & William N. Eskridge, Jr., Chevron *as a Canon, Not a Precedent: An Empirical Study of What Motivates Justices in Agency Deference Cases*, 110 Colum. L. Rev. 1727, 1811 (2010))).

However, that debate need not be resolved here for several reasons. First, the majority's artificial line of demarcation is not supported by logic or the case law on which it relies. What is readily apparent is that the majority treats this case differently than the majority treated the near identical circumstances of *Hull* based on supreme court precedent that *predated* the *Hull* case and the *Conage* opinion. And quite simply, nothing pertinent has changed since *Hull*, and whatever change was effected by *Conage* did not alter the precedential effect—or lack thereof— of prior cases that applied the recent controversy rule. Indeed, the majority cites cases *predating* both *Hull and Conage* for the proposition that the supreme court "has *now* instructed us" to "follow the 'supremacy-of-text' principle." (Emphasis added) (quoting *Ham*, 308 So.

70

3d at 946). This raises the unanswered question of what the supreme court was doing in *Ham* or the several other pre-*Conage* supreme court cases decided based on the supremacy-of-text principle (merely *suggesting* its availability as an interpretive tool?). The fatal shortcomings of the majority's selection of one *among many* prior and subsequent supreme court supremacy-of-text opinions as a point certain at which the recent controversy rule can "*no longer* be aligned within current Florida jurisprudence" belie the gravamen of its "paradigm shift" rationale for the course correction. (Emphasis added.). So, even if the supremacy-of-text principle is subject to *vertical* stare decisis[15]—an open question for which I concede a case could possibly be made—the utilization of the interpretive method in *Conage* cannot be deemed a *holding* that obligates inferior courts to consider the supreme court to have overruled sub silentio its previous approval of the use of the recent controversy rule. *See Stevens v. State*, 226 So. 3d 787, 792 (Fla. 2017) (explaining that the supreme court does not overrule itself sub silentio); *accord Arsali v. Chase Home Fin. LLC*, 121 So. 3d 511, 516 (Fla. 2013); *Roberts v. Brown*, 43 So. 3d 673, 683 (Fla. 2010); *Tompkins v. State*, 994 So. 2d 1072, 1088 (Fla. 2008); *Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002).

Another reason we need not at this time resolve the debate about what binding effect to afford methodological precedent such as legislative intent primacy or textual supremacy is that there are other more

---

[15] *See* Abbe R. Gluck, *The States as Laboratories of Statutory Interpretation: Methodological Consensus and the New Modified Textualism*, 119 Yale L.J. 1750, 1773 n.73 (2010) (contrasting "horizontal methodological stare decisis"—when "the state supreme court itself follows its own previous methodological statements from case to case"—with "vertical methodological stare decisis"—"which involves the relationship between higher and lower courts").

compelling reasons to reject application of the recent controversy rule in this case and others—even leaving aside the question of whether the recent controversy rule itself was ever binding precedent subject to stare decisis. For one, there is a paucity of case law indicating that the recent controversy rule should be applied—as it was in *Hull*—"explicitly" and admittedly "in contravention of the plain meaning of the text of the previous version of the statute and in conflict with a prior panel decision of this court implementing a fair reading of that unambiguous text." *Hull*, 349 So. 3d at 473 (Atkinson, J., dissenting) (comparing the majority's decision to *Leftwich v. Florida Department of Corrections*, 148 So. 3d 79, 86 (Fla. 2014), in which "[t]he court referenced the legislature's subsequent pronouncement of intent in the bill amending the statute as support for the proposition that the legislature had *always* intended an interpretation *consistent with* the text of the preamendment statute to be the effect of the statute—i.e., as 'a clarification of original legislative intent rather than a change in the law' " (emphasis added) (quoting *Leftwich*, 148 So. 3d at 86)).

More importantly, there is no case law applying the recent controversy rule to impose on the version of the statute in effect at the relevant time a meaning its text cannot bear in violation of the constitutional prohibitions against ex post facto laws or the impairment of the obligations of a contract. *See, e.g., id.* at 473 (Atkinson, J., dissenting) ("Thus, *Madison at Soho II*'s discussion of retroactivity and the constitutional provisions it could theoretically violate—e.g., the ex post facto clause, the impairment of contract clause—is dicta because there was never any danger in that case of violating such constitutional provisions because this court was applying the statute in accordance with the plain and ordinary meaning of the text of the *preamendment*

version of the statute in effect at the time of the facts giving rise to the controversy." (emphasis in original)). Despite the requirement to follow the decisions of the Florida Supreme Court and the generally accepted obligation to follow prior panel precedent, I am "not aware of any published opinion of the Florida Supreme Court that applies the recent controversy rule to retroactively impose a criminal liability that was not supported by the text of the statute at the time of the alleged offense." *Id.* at 471–72 (Atkinson, J., dissenting). While the Florida Supreme Court has applied the recent controversy rule in a criminal case, it did *not* do so to contravene the meaning of the language of the statute in effect at the time of the alleged commission of the crime (which is what the *Hull* majority admittedly did), but rather to clarify legislative intent that was consistent with the unambiguous language of the original statute. *See Leftwich*, 148 So. 3d at 85–88; *Lanier*, 464 So. 2d at 1193. And none of this court's prior opinions construing the recent controversy rule "contain binding interpretations of constitutional provisions" that should have precluded application of the rule. *Hull*, 349 So. 3d at 473 (Atkinson, J., dissenting) (distinguishing this court's decision in *Madison at Soho II Condo. Ass'n v. Devo Acquisitions Enters., LLC*, 198 So. 3d 1111 (Fla. 2d DCA 2016), on the grounds that its constitutional discussion was dicta and that the court "decided that the recently enacted pronouncement of legislative intent was *consistent* with the plain meaning of the text of the pre-amendment version of the statute").

And even conceding for the sake of analysis that courts *were* bound by the legislative-intent-as-polestar interpretive method that the majority in this case describes as preeminent prior to *Conage*, the majorities in *Hull* and in *Madison at Soho* were giving effect to the *wrong* legislative intent. In those opinions, the judicial branch was showing deference to

73

the wrong legislature—not the one that enacted the law in effect at the time of the facts giving rise to the action but the one that issued a post hoc legislative pronouncement enacted after the time period in question. *See id.* at 468 (Atkinson, J., dissenting) ("While implementation of the recent controversy doctrine deceptively defers to a *subsequent* legislative pronouncement, it can be used to usurp the authority of the legislature that enacted the text of the applicable version of the statute and supplant those words with an expression of more recent legislative will that is potentially in derogation of the text." (emphasis in original)).  In so doing, instead of maintaining the separation of powers, implementation of the recent controversy rule by those courts was *subverting* the separation of powers by supplanting the text enacted by the legislature in the version of the statute applicable to the controversy with language included in a law that was not enacted until later in time.

> Just as imposition of a judge's perception of what the law *should* say instead of what the text means would be a violation of the supremacy of the text principle as well as the separation of powers, adoption of a subsequent legislature's pronouncement of intent as to what a law *should have* said when it was enacted in the past instead of what it *actually did* say is likewise a violation of the supremacy of the text principle and separation of powers.  Just as in the former, the judge in the latter scenario is applying something other than the ordinary meaning of the text enacted by the legislature that drafted and enacted the language of the pre-amendment statute.

*Id.* (Atkinson, J., dissenting) (emphasis in original) (citations omitted).

In this case, as in *Hull*, that subversion of the rule of law and violation of the separation of powers would adversely affect a litigant's constitutional right against ex post facto laws.  *See Griffin v. State*, 980 So. 2d 1035, 1036 (Fla. 2008) (explaining the test of whether a law violates the ex post facto clause as "(1) whether the law is retrospective in

effect; and (2) whether the law alters the definition of criminal conduct or increases the penalty by which a crime is punishable").  The amended statute and legislative expression of intent that the State would have us apply in this case changes the plain and ordinary meaning of the preamendment statute that was in effect at the time of Mr. Crose's alleged offense, such that the amendment alters what constitutes the crime of failure to report as a sexual offender to something different than what constituted the crime at the time of Mr. Crose's failure to act.  *See Hull*, 349 So. 3d at 469 (Atkinson, J., dissenting) ("Under the pre-amendment section 943.0435, the defendant was not subject to the obligation he is alleged to have criminally failed to perform.  Application of the legislature's amendment that explicitly rejected the *James* opinion such that it would govern the application of the pre-amendment section 943.0435, would violate the constitutional prohibition of ex post facto laws." (citations omitted)).

In summation, there are several compelling reasons to reject application of the recent controversy rule without addressing the questions of methodological stare decisis that the majority's rationale necessarily raises.  I reject the majority's rationale because it is both chronologically challenged and because I cannot accept one of its necessary premises.  Whatever precedential effect the recent controversy rule has or had—and I do not concede it ever had binding effect—I do not agree that in this case the court was compelled to apply the recent controversy rule by any decision of the supreme court or any pre-*Hull* decision of this court.

The arbitrariness of the majority's chronology has real-world consequences.  Mr. Crose is being treated differently than Mr. Hull.  The majority in his case did not consider the purported crossing of the

75

Rubicon that it and the rest of the en banc majority now announces to have occurred at a time that was, unfortunately for Mr. Hull, too late for him. I would have granted Mr. Hull the relief afforded to Mr. Crose today when Mr. Hull advanced similar arguments in his case.[16]

Accordingly, in this case, I concur in result for the reasons herein and those on which I elaborated in my dissenting opinion in *Hull.* I would apply the ordinary meaning of the statute's text as it existed at the time of Mr. Crose's alleged offense because the recent controversy rule, deeply flawed as it is on its merits, is also not something this court is bound to apply in this case (if any). But I cannot agree with my colleagues in the majority that such a result in this case is supported by a purportedly binding precedent-setting "paradigm shift" in statutory interpretation, the existence of which the majority does not adequately

_____

[16] The majority in *Hull* avoided the ex post facto argument I advanced in my dissenting opinion on the basis that it had not been raised by Mr. Hull on appeal, 349 So. 3d at 464–65, even though Mr. Hull had argued that his conduct should be governed by the version of the statute in effect at the time of the alleged crime and not the later-enacted version under the recent controversy rule. I rejected that stilted and extreme application of the party presentation requirement (the rule generally limiting appellate courts to reviewing for error only based on the arguments raised by the parties). In this case there is no debate about whether the ex post facto issue is before the court. However, by the en banc majority's rationale, the constitutional protection that prevents application of the amended version of the statute to Mr. Crose's preamendment conduct in this case could not have been applied to Mr. Hull—not because Mr. Hull did not explicitly raise it, but because Mr. Hull's case was decided before "the advent of *Ham* and *Conage,*" at a time when, according to the majority's rationale, the use of the recent controversy rule could still be justified as a constitutional "means of clarifying intent" that had not yet become obsolete. For the reasons explained herein, I do not share that view. The analysis that should have afforded Mr. Hull relief from the violation of his constitutional rights applies equally to Mr. Crose in this case.

support and, even if it could, was already in effect (but not applied) under identical circumstances in *Hull.*

_____

Opinion subject to revision prior to official publication.